(Nos. 63886, 63910, 63916 cons.—

ZURICH INSURANCE COMPANY *et al.*, Appellants and Cross-Appellees, v. RAYMARK INDUSTRIES, INC., Appellee and Cross-Appellant.

*Opinion filed September 14, 1987.*

WARD, J., took no part.
SIMON, J., concurring in part and dissenting in part.

Peter C. John and Mary Patricia Benz, of Phelan, Pope & John, Ltd., of Chicago, for appellant Zurich Insurance Company.

Frank K. Heap, Larry L. Thompson, Joan S. Kato, P. Andrew Fleming, Laurie D. Jaffe and Timothy J. Thurlow, of Bell, Boyd & Lloyd, of Chicago, for appellant Raymark Industries, Inc.

Dowd & Dowd, Ltd., of Chicago (Michael E. Dowd, Nancy J. Gleason and Philip J. McGuire, of counsel), for appellant Northbrook Excess and Surplus Insurance Company.

White & Case, of New York, New York (Paul J. Bschorr, Thomas McGanney, Richard B. Sypher and Joan Morgan McGivern, of counsel), and Peterson, Ross, Schloerb & Seidel, of Chicago (Robert G. Schloerb, Michael M. Lane and Richard R. Ryan, of counsel), for appellee Federal Insurance Company.

Williams & Montgomery, Ltd., of Chicago (James K. Horstman, Barry L. Kroll, Anthony P. Katauskas and Lloyd E. Williams, Jr., of counsel), for appellee Commercial Union Insurance Company.

Stewart Dalzell, Wilson M. Brown, III and Steven P. Chawaga, of Drinker, Biddle & Reath, of Philadelphia, Pennsylvania, and Walter M. Jones and Gary E. Jackson, of McDermott, Will & Emery, of Chicago, for *amici curiae* American Motorists Insurance Company and American Manufacturers Mutual Insurance Company.

Haskell & Perrin, of Chicago (Donald M. Haskell,

Michael J. Sehr and Andrew Kochanowski, of counsel), for *amicus curiae* The Home Insurance Company.

Terrence E. Kiwala, of Rooks, Pitts and Poust, of Chicago (John P. Arness, P.C., Andrew D. Klingenstein and Neil M. Corwin, of Hogan & Hartson, of Washington, D.C., of counsel), for *amicus curiae* First State Insurance Company.

Gerald V. Weigle, Jr., of Dinsmore & Shohl, of Cincinnati, Ohio, for *amicus curiae* Liberty Mutual Insurance Company.

Malcolm M. Gaynor and Richard Bendix, Jr., of Schwartz, Cooper, Kolb & Gaynor, of Chicago, and Ronald M. Oster, Carl W. Shapiro and Philip Heller, of Paul, Hastings, Janofsky & Walker, of Santa Monica, California, for *amicus curiae* UNR Industries, Inc.

Gary M. Elden, Donald A. Vogelsang and Darrell J. Graham, of Isham, Lincoln & Beale, of Chicago, for *amicus curiae* Fireman's Fund Insurance Company.

Frank H. Griffin III, of Dechert, Price & Rhoades, of Philadelphia, Pennsylvania, for *amicus curiae* AC and S, Inc.

Robert N. Sayler, William P. Skinner and Frederick G. Herold, of Covington & Burling, of Washington, D.C., and Christopher Ziebart and Michael B. Solow, of Hopkins & Sutter, of Chicago, for *amicus curiae* Armstrong World Industries, Inc., *et al.*

Ronald L. Motley and Thomas H. Hart III, of Barnwell, South Carolina, for *amicus curiae* Blatt & Fales.

E. Judge Elderkin and William R. Irwin, of Brobeck, Phleger & Harrison, of San Francisco, California, for *amicus curiae* Fibreboard Corporation.

Donald E. Seymour, Peter J. Kalis, Carolyn N. Branthoover and Lorraine A. Mansour, of Kirkpatrick & Lockhart, of Pittsburgh, Pennsylvania, for *amicus curiae* H.K. Porter Company, Inc.

Howard A. Mileaf, of New York, New York, for *amicus curiae* Keene Corporation.

William A. Sawinski, of Toledo, Ohio, for *amicus curiae* Owens Corning Fiberglas Corporation.

James T. Otis, Robert A. Creamer, Robert C. Gislason, Patty J. Dyer and Jeanine M. Jiganti, of Keck, Mahin & Cate, and Arthur G. Leisten and Christopher J. McElroy, all of Chicago, for *amicus curiae* United States Gypsum Company.

JUSTICE MORAN delivered the opinion of the court:

This declaratory judgment action involves the construction of various comprehensive general liability insurance policies issued to the defendant, Raymark Industries, Inc. (Raymark). In 1978, Zurich Insurance Company (Zurich), one of Raymark's primary insurers, filed this action in the circuit court of Cook County against Raymark and two of Raymark's other primary insurers, Federal Insurance Company (Federal) and Commercial Union Insurance Company (Commercial Union). Zurich sought a declaration of its obligations and the obligations of Federal and Commercial Union to defend and indemnify Raymark in thousands of underlying actions filed by individuals alleging personal injuries or wrongful death resulting from exposure to asbestos-containing products manufactured by Raymark. Federal (and another insurer which is not a party to this appeal) filed jury demands with their answers. In February 1979, Northbrook Excess and Surplus Insurance Company (Northbrook), one of Raymark's excess insurers, in-

tervened as a plaintiff, seeking relief identical to that sought by Zurich. In October 1982, Raymark filed a counterclaim seeking a declaration that each of its primary insurers is obligated to provide a complete defense in all present and future asbestos-related actions and that the insurers' defense obligations continued even after the aggregate policy limits had been exhausted. Commercial Union filed a jury demand with its answer to Raymark's counterclaim. The circuit court struck the jury demands of Federal and Commercial Union, holding that the claims raised were essentially equitable in nature.

After denying cross-motions for summary judgment, the court heard extensive expert medical testimony. In a lengthy memorandum opinion and order, the circuit court found that the policy language was unambiguous and did not require extrinsic evidence to interpret its meaning. The court determined that a primary insurer is required to provide coverage of a claim if the claimant sustained either "bodily injury," "sickness," or "disease" during a policy period. The court concluded that "bodily injury" occurs simultaneously with, or shortly after, inhalation of asbestos fibers, and that a "disease" occurs when it is reasonably capable of being diagnosed. The court further concluded that a claimant who has not been diagnosed as having an asbestos-related disease, but "suffers from a disordered, weakened or unsound condition," may be classified as having a "sickness" which would also give rise to an insurer's obligations under the policies. Exactly when a claimant's sickness or disease occurs, the court found, must be determined on a case-by-case basis. Accordingly, the court declared that a primary insurer is required to provide coverage of a claim if its policy was in effect either during the time when the claimant was exposed to Raymark's products

or when the claimant's asbestos-related disease was reasonably able to be detected and diagnosed.

The court went on to declare that, under the terms of policies issued to Raymark on or before September 26, 1967 (the pre-1967 policies), the primary insurers are obligated to defend new claims and to continue to defend claims pending against Raymark even after the liability limits of those policies are exhausted by the payment of judgments or settlements. In addition, the court held that under the terms of the policies issued on and after September 26, 1967 (the post-1967 policies), a primary insurer that had undertaken the defense of a claim prior to the exhaustion of the limits of its policy must continue to defend that claim even after the exhaustion of the policy limits unless and until another primary insurer, that is also obligated to defend the claim, assumes the defense of that claim.

The court further held that as between Raymark and its primary insurers, when coverage is required under more than one policy, each primary insurer that is required to provide coverage is fully and independently obligated to defend and indemnify Raymark. In those cases, the court held that Raymark is entitled to designate any triggered policy for defense of a claim and any triggered policy for indemnification of the claim and that the policy designated for defense need not be the same as the one designated for indemnification. The court reserved ruling on the allocation of defense and indemnity costs among the various insurers. The insurers appealed and Raymark cross-appealed.

The appellate court affirmed in part, modified in part, and reversed in part. (145 Ill. App. 3d 175.) First, the court affirmed in its entirety the circuit court's determination as to which events require an insurer to provide coverage for a claim. (145 Ill. App. 3d 175, 192.) The court reversed the circuit court's order with respect to

the pre-1967 policies and held that those policies do not require the insurers to defend new claims commenced against Raymark after the policy limits are exhausted by payment of judgments or settlements. (145 Ill. App. 3d 175, 193.) The appellate court further held that those policies do not obligate a primary insurer to continue to fund the defense of actions pending against Raymark once its duty to indemnify has been terminated by the payment of judgments or settlements and the insurer has made an orderly withdrawal from Raymark's defense. (145 Ill. App. 3d 175, 193-94.) Next, the court modified the circuit court's order to provide that upon exhaustion of the limits of its post-1967 policies, Zurich has no obligation to continue to pay the costs of defending cases that it had already undertaken to defend prior to the exhaustion of the policy limits. (145 Ill. App. 3d 175, 196.) The court then concluded that the trial court did not err in denying Zurich's motion to order the *pro rata* allocation of the costs of defense and indemnity among the triggered policies. (145 Ill. App. 3d 175, 200.) Finally, the court affirmed the circuit court's order striking the jury demands of Federal and Commercial Union. (145 Ill. App. 3d 175, 198.) We granted Zurich, Raymark and Northbrook leave to appeal. The causes have been consolidated for the purposes of review.

Five issues have been raised in this court: (1) What event or events give rise to the primary insurers' obligation to provide coverage for asbestos-related claims under the standard comprehensive general liability policy, and when do those events occur? (2) Do the terms of the policies issued to Raymark before September 26, 1967 (the pre-1967 policies), require the primary insurers to defend new actions and to continue to defend actions pending against Raymark after the limits of liability under those policies have been exhausted by the payment of judgments or settlements? (3) Do the terms of the pol-

icies Zurich issued after September 26, 1967 (the post-1967 policies), require Zurich to continue to defend actions pending against Raymark after the limits of those policies have been exhausted by the payment of judgments or settlements?[1] (4) Should the defense and indemnity costs of each claim be allocated among the various primary insurers and Raymark on a *pro rata* basis? and (5) Was Federal Insurance Company entitled to a jury trial?

Raymark (formerly Raybestos-Manhatten, Inc.) has manufactured products containing asbestos since the 1920's. Raymark is currently a defendant in more than 30,000 lawsuits pending in both State and Federal courts throughout the United States in which plaintiffs have alleged injuries caused by exposure to asbestos products. The plaintiffs in these underlying actions typically allege that they or their decedents contracted asbestosis, mesothelioma or bronchogenic carcinoma (lung cancer) resulting from exposure to asbestos products, including products manufactured and sold by Raymark, during the 1940's, 1950's and 1960's.

Since 1941, Raymark has been insured under various comprehensive general liability insurance policies issued by the primary insurers in this case. The Employers' Liability Assurance Corporation, the predecessor in interest to Commercial Union, insured Raymark from May 1, 1941, through May 1, 1945, and from February 4, 1947, through February 4, 1950. Federal and its predecessor in interest, United States Guaranty Company, insured Raymark from September 26, 1951, through September 26, 1967. Commercial Union insured Raymark from Sep-

---

[1]Zurich insured Raymark after October 15, 1969. Commercial Union insured Raymark between September 26, 1967, and October 15, 1969. Commercial Union has not, however, raised this issue in this court.

tember 26, 1967, through October 15, 1969. Zurich insured Raymark after October 15, 1969. Northbrook has issued excess policies since 1976.

The circuit court found, as we do, that the policies at issue are identical in all relevant respects and warrant the same interpretation. The language of the policies that Zurich issued to Raymark is typical. Those policies provide:

"I. COVERAGE A—BODILY INJURY LIABILITY
* * *

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage A. bodily injury ***
***

*** caused by an occurrence ***."

The policies also set forth the following definitions:

" 'bodily injury' means bodily injury, sickness or disease ***.
***

'occurrence' means an accident, including injurious exposure to conditions, which results during the policy period, in bodily injury *** neither expected nor intended from the standpoint of the insured."

When Raymark tendered the asbestos-related actions to its insurance companies for defense, disputes arose among Raymark and its insurance carriers concerning the interpretation of the policies' coverage of asbestos-related claims. Zurich filed this action for declaratory judgment in 1978. Zurich contended that coverage was triggered only when a claimant inhaled asbestos fibers and that the defense and indemnity obligations for each claim are to be allocated among the various insurers who were on the risk during the years when the claimant was exposed to asbestos in proportion to the number of years that each carrier was on the risk throughout the claim-

ant's exposure. Federal and Commercial Union argued that their respective policies provided coverage only for those claims in which the asbestos-related injury first manifested itself during a policy period. Raymark initially advocated the exposure theory advanced by Zurich. In June 1981, Zurich moved for summary judgment, asking the court to declare that coverage was triggered only by exposure to asbestos. Raymark submitted a memorandum in support of Zurich's motion. On October 1, 1981, in an unrelated action construing the comprehensive general liability policy's coverage for asbestos-related diseases, the United States Court of Appeals for the District of Columbia held that each insurer on the risk from a claimant's initial exposure to asbestos through the manifestation of a disease is liable to its insured for the costs of defense and indemnification. (*Keene Corp. v. Insurance Co. of North America* (D.C. Cir. 1981), 667 F.2d 1034, 1040-41, *cert. denied* (1982), 455 U.S. 1007, 71 L. Ed. 2d 875, 102 S. Ct. 1644.) Less than three weeks later, Raymark withdrew its support for Zurich's motion for summary judgment and argued that the court should apply the *Keene* approach. The circuit court denied the motion for summary judgment, ruling that medical evidence concerning the cause and course of development of asbestos-related diseases was necessary to determine how the policy language applied to asbestos-related diseases.

During a hearing that began on May 2, 1983, and concluded on June 7, 1983, the court heard extensive medical testimony from nine experts who were board certified clinicians or pathologists. The trial court summarized the evidence in a lengthy memorandum opinion and order. The appellate court's summarization was taken in large part from the circuit court's memorandum opinion. After reviewing the record, we find that the circuit court's and the appellate court's summarizations of the evidence are

correct. (See 145 Ill. App. 3d 175, 183-86.) The evidence showed that asbestosis begins when a person first inhales asbestos fibers. The body's defense mechanisms eliminate most of the inhaled fibers. Nevertheless, the average worker would have retained as many as one million asbestos fibers in his lungs in a single year. These fibers then settle in the small air passages in the lower respiratory tract known as the respiratory bronchioles and alveolar duct bifurcations. These are the first portions of the respiratory system in which the oxygen-carbon dioxide gas exchange takes place. The sharp-ended asbestos fibers, likened to slivers of glass, puncture the epithelium, or surface layer of the cells of the alveolar walls, and are believed to continuously injure the lung's tissue with every inhalation and expiration.

Ordinarily, the lung reacts to the presence of foreign particulate matter by activating scavenger cells known as alveolar macrophages. The macrophages attack and envelop organic foreign particles in a process known as phagocytosis. Once the macrophage engulfs the particle, it releases enzymes stored within the cell which destroy the foreign particle. This system is ineffective, however, against asbestos fibers. If the fiber is short, the macrophage can completely envelop it. But if, as is more often the case, the fiber is long, the macrophage cannot completely ingest it. In that case, the macrophage membrane disintegrates and releases harmful enzymes into the surrounding lung tissue. This process takes place almost immediately after the fibers become lodged in the lung.

Once the macrophage is damaged and secretes its enzymes, other macrophages are activated which, in turn, are also punctured and release additional destructive enzymes which activate still more macrophages. This cycle becomes self-perpetuating. In addition, the macrophages secrete a substance which activates the white blood cells, or lymphocytes. Lymphoctyes attract more macrophages

and also secrete a different substance that stimulates the macrophages to work harder and eventually become hyperactive. This process, in turn, increases the amount of enzymes produced by the macrophages and activates even more macrophages.

The macrophages, lymphocytes and the asbestos fibers also activate fibroblasts. Fibroblasts are the cells which normally function within the interstitium of the lung producing collagen, the connective tissue which keeps the lungs from collapsing. The increase in the number of fibroblasts results in an increase in the production of collagen in the lower respiratory tract. The collagen, in turn, forms fibrosis, or scar tissue, in the alveoli which prevents the lung from performing its normal oxygen-carbon dioxide gas exchange. The pathologists testified, with a reasonable degree of medical certainty, that this process begins at or shortly after the inhalation and retention of asbestos fibers. Based on studies using both human and animal tissue, the pathologists were of the opinion that the cells of the human lung react to the presence of asbestos fibers almost immediately; and, that with continuing exposure to asbestos, clinical evidence of fibrosis can appear in as little as five years.

Mesothelioma is a malignant tumor that invades the membranous covering of the lung, which is known as the pleura, or the lining of the diaphragm, which is called the peritoneum. Although little is known about the disease, it is generally believed that it is attributable to asbestos fibers that pierce through the alveoli into either the pleura or the peritoneum. Shortly after, these fibers injure and irritate the lining, causing a pre-malignant disease known as atypia. Then, there follows a long latency period before the actual manifestation of a mesothelial tumor.

Bronchogenic carcinoma originates in the cells that line the bronchial tubes. There was testimony based upon limited experimentation, that asbestos alone would not

cause this type of cancer. When coupled with cigarette smoke, however, the two interact synergistically to cause cancer. Before it is clinically detectable, bronchogenic carcinoma progresses through several stages. By the time the tumor has grown to a size large enough to detect by an X ray, however, the disease is usually terminal.

While the clinicians agreed with the pathologists' testimony regarding the pathogenesis of asbestos-related diseases, they disagreed with them as to the point in time when the diseases occur. Unlike the pathologists, the clinicians' testimony emphasized an individual's susceptibility to disease. The clinicians were of the opinion, based on a reasonable degree of medical certainty, that even if the inhalation of asbestos fibers causes microscopic injury to the cells of the lung, the lung has the capacity to repair localized damage, and can even reverse fibrosis. Eventually, though, for some unknown reason, the lungs' defense mechanisms are overcome. It is at this point, in the opinion of the clinicians, that asbestosis begins to develop. But because the effectiveness of every individual's defense mechanisms varies depending upon various factors, including the duration and intensity of exposure, no general rules can be developed. Nevertheless, the clinicians concluded that while it is not possible to determine exactly when a disease begins, it cannot be said to begin when asbestos fibers are first inhaled. Rather, it is more likely that asbestosis does not begin to develop until many years after exposure, in the years closest to the clinical manifestation of the disease. Because of the variability of an individual's susceptibility to asbestosis, the clinicians testified that a disease does not occur until it is capable of being diagnosed. In the absence of symptoms or signs characteristic of an asbestos-related disease, the clinicians testified that they were unable to diagnose a disease with any degree of medical certainty.

## I. THE COVERAGE ISSUE—WHAT EVENT OR EVENTS TRIGGER COVERAGE UNDER THE STANDARD COMPREHENSIVE GENERAL LIABILITY POLICY?

### THE PARTIES' ARGUMENTS

Zurich contends that the appellate court erred in holding that events other than exposure to asbestos give rise to the insurers' obligation to afford coverage. In support of this argument, Zurich maintains that in interpreting the policies at issue, the appropriate focus is not upon the definition of "bodily injury," but upon the definition of "occurrence," and that an "occurrence" is the event that determines the insurers' duties under the policies. According to Zurich's interpretation, an occurrence consists of two elements—an accident, and bodily injury during the policy period. In the case of asbestos-related diseases, exposure to asbestos fibers is an "accident." The medical evidence demonstrates that exposure to asbestos fibers causes immediate bodily injury in the form of cellular damage to the lungs. This bodily injury completes an "occurrence," as defined in the policy, and thus triggers coverage under the policy then in force even though the injury cannot be detected at that time and the cumulative effect of the injury has not yet manifested as a disease.

The compensable damages flowing from a claimant's initial exposure to asbestos may include sickness, disease and ultimately death. Zurich submits that these elements of damage do not, however, trigger additional coverage in the absence of new exposure to asbestos. Each new exposure to asbestos, on the other hand, causes another separate and distinct bodily injury and thus completes another occurrence. That new occurrence, in turn, will trigger coverage under the policy then in effect.

Northbrook, one of Raymark's excess insurance carriers, also contends that exposure to asbestos fibers is the only event that triggers coverage. Unlike Zurich, however, Northbrook argues that "bodily injury" is the crucial event that must take place during the policy period. Northbrook submits that the medical evidence overwhelmingly proves that bodily injury happens when—and only when—a person inhales and retains asbestos fibers in the lungs. Northbrook agrees with Zurich that whatever happens to a claimant thereafter is not a series of discrete injuries, but only the development of the injury sustained at the time of exposure. Therefore, Northbrook reasons, the time when a claimant's asbestos-related disease becomes manifest or diagnosable is irrelevant to the determination of whether an insurer must afford coverage.

Federal contends that according to the plain and unambiguous language of the policies, an insurer is required to provide coverage only if the claimant's asbestos-related disease manifested itself during the policy period. In support of its position, Federal argues that the proper analysis requires the determination, first, of the nature of the event ostensibly triggering coverage, and second, of when that event occurred. Federal submits that given the ordinary meaning of the terms "injury" and "disease," it is necessary to conclude that asbestosis, mesothelioma and bronchogenic carcinoma are diseases, not injuries. Having reached this conclusion, it is then necessary to determine when, in a given case, the claimant's disease occurred. Federal asserts that asbestosis, mesothelioma and bronchogenic carcinoma occur when the body's defense mechanisms are overcome and can no longer cope with the cellular changes that occur in response to the inhalation of asbestos fibers. At what point in time this happened is a question of fact to be determined on a case-by-case basis.

Federal also argues that the appellate court erred by failing to recognize that liability insurance coverage is determined by the allegations of the complaint in the underlying tort action. According to Federal, an insurer's duties can be determined only after reading every underlying plaintiff's complaint. There is no evidence that any of those plaintiffs seek damages for microscopic or cellular "injury" as defined by the pathologists. Instead, the claimants seek damages for asbestos-related diseases. Consequently, the obligation to afford coverage of a claim necessarily falls on the carrier on the risk when the claimant shows evidence of the disease for which he seeks damages.

Federal also argues that its policies were intended to cover only *compensable* injuries. Federal insists that manufacturers insure only against compensable injuries or diseases, not against microscopic changes at the cellular level.

As previously noted, the circuit court found that the language of the various policies at issue is similar in all material respects and warrants the same interpretation. The appellate court reached the same conclusion. (See 145 Ill. App. 3d 175, 181.) Nevertheless, Federal now argues for the first time in its reply brief that this conclusion is erroneous. Federal's policies provide that Federal agrees:

> "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease *** sustained by any person."

Federal notes that its policies, unlike Zurich's policies, do not require that the bodily injury, sickness or disease be caused by an occurrence. Thus, Federal concludes that the appellate court's analysis of the language contained in Zurich's policies is irrelevant to the proper

analysis of Federal's policies. We find this argument to be without merit.

Commercial Union asserts that, unlike the other parties, it does not espouse any of the "coverage theories." Instead, Commercial Union asks this court to hold that the coverage issue must be determined on a case-by-case basis. The insurer's duty to defend is determined by the allegations of the complaint in the underlying action. If the complaint alleges facts within the coverage or the potential coverage of the policy, the insurer has the duty to defend the action. (*Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 193.) If, on the other hand, the complaint does not seek a recovery which, if obtained, would be paid by the insurer under its duty to indemnify, then the insurer is not obligated to defend the action. Under the various policies Raymark purchased, the insurer's duty to indemnify is limited to bodily injury occurring during the policy period. An action which either alleges no bodily injury during the policy period or seeks no recovery for injuries allegedly sustained during the policy period states no basis for potential indemnity coverage. Consequently, an insurer has no duty to defend such an action.

On the basis of the medical evidence in the record, the circuit court found that bodily injury begins with the initial exposure to asbestos and, with continued exposure, continues through the time when a disease manifests itself. The plaintiffs in the underlying tort actions typically do not allege or seek damages for microscopic injuries to the cells of their lungs at the time they inhaled asbestos. Rather, they allege and seek damages for a manifested disease. Commercial Union submits that the circuit court, in holding that the carriers on the risk at the time of exposure must provide coverage, erroneously presumed that every plaintiff in an asbestos-related action also alleges and seeks recovery for injuries

occurring before the time when a disease manifested itself. Instead, Commercial Union maintains that each and every complaint must be examined individually to determine whether it alleges facts which bring the action within the coverage or potential coverage of the policy.

Raymark interprets the policies as containing three separate and distinct triggers of coverage. As appellee, Raymark urges this court to affirm the circuit court's findings that "bodily injury" encompasses the microscopic and clinically undetectable damage to lung cells that takes place when asbestos fibers are inhaled and retained in the lung. In response to Federal's argument that coverage is triggered only when an asbestos-related disease manifests itself, Raymark notes that the policy language provides coverage when bodily injury, sickness or disease occurs during the policy period, not when bodily injury, sickness or disease becomes compensable or manifest. In response to Zurich's argument, Raymark notes that the policy language provides coverage when bodily injury, sickness or disease occurs within the policy period, not when the event which causes that bodily injury, sickness or disease occurs. Accordingly, regardless of when the causative event happened, the insurers' obligations under the policies arise when the resulting bodily injury, sickness or disease occur during the policy period. Finally, contrary to Commercial Union's argument, Raymark does not contend that its insurers owe it any duties whatsoever without reference to the underlying tort complaints. Rather, Raymark maintains that the undisputed evidence concerning the pathogenesis of asbestos-related diseases shows that "bodily injury," as defined by the policies at issue, takes place continuously from the time of an alleged exposure to asbestos through the time a claimant files an action alleging an asbestos-related disease. Consequently, any carrier having a policy in effect during that time is obligated to afford coverage.

As cross-appellant, Raymark argues that the circuit court and the appellate court erroneously determined that there is no continuing bodily injury between the time a claimant's exposure to asbestos ceases and the time an asbestos-related disease becomes diagnosable. Raymark insists that every individual who ultimately manifests an asbestos-related disease necessarily continues to sustain microscopic bodily injuries during periods of nonexposure which preceded the clinical onset of an asbestos-related disease. These ongoing bodily injuries, Raymark contends, also trigger coverage. Consequently, Raymark takes the position that each and every carrier whose policy or policies were in effect at any time between a claimant's initial exposure to asbestos and his manifestation of an asbestos-related disease must provide coverage. Raymark submits that the trial court's conclusion, that there may be no progression of disease after exposure ceases, is contrary to the manifest weight of the evidence and inconsistent with the court's other findings.

## ANALYSIS
### *What events trigger coverage?*

Contrary to Zurich's argument, the circuit court and the appellate court correctly found that coverage is triggered by "bodily injury," as defined in the policies, which occurs during the policy period. The plain language of Zurich's policies provides that:

> "The [insurance] company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of *** *bodily injury* *** caused by an occurrence ***." (Emphasis added.)

This language unambiguously provides that "bodily injury" is the event which gives rise to the insurers' obligations under the policies. In addition, the definition of "occurrence" requires that the exposure to conditions

result in bodily injury during the policy period. Finally, Insuring Agreement IV of the policies Zurich issued before December 31, 1975, provides:

> "IV. POLICY PERIOD, TERRITORY
>
> This insurance applies only to bodily injury *** which occurs during the policy period within the policy territory."

Beginning with the policy issued December 31, 1975, Zurich amended its policy by deleting the phrase "during the policy period" from Insuring Agreement IV. At the same time, however, this phrase was added to the definition of "bodily injury":

> " 'bodily injury' means bodily injury, sickness or disease sustained by any person *which occurs during the policy period* ***." (Emphasis added.)

Thus, the plain language of the policies unambiguously provides that the insurable event which gives rise to the insurer's obligation to provide coverage (*i.e.*, the "trigger of coverage") is not the exposure to conditions, but the resulting "bodily injury."

"Bodily injury," which gives rise to the insurer's duties under the policies, is defined as "bodily injury, sickness or disease." The circuit court and the appellate court correctly concluded that these terms must be read as separate and distinct triggers of coverage. Thus, under the plain and unambiguous language of the policies, an insurer must provide coverage for a claim if the claimant sustained "bodily injury" or "sickness" or "disease" during the policy period. Having concluded that each of these events triggers coverage, the inquiry becomes when "bodily injury," as defined in the policy, occurs.

### When does "bodily injury" occur?

The circuit court, after hearing extensive expert medical testimony, found that asbestos fibers cause physical

and biochemical injuries to the cells of the lung at or shortly after inhalation. Zurich and Northbrook agree that these microscopic injuries, although they cannot be detected, constitute "bodily injury." Federal does not take issue with the circuit court's finding that lung cells are physically and chemically damaged by asbestos fibers. Instead, Federal contends that in adopting the pathologists' technical definition of the term "injury," the court erroneously characterized asbestosis, mesothelioma and bronchogenic carcinoma as "injuries" rather than "diseases." We find this argument to be without merit. The trial court did not, as Federal suggests, hear medical testimony to assist it in defining the terms "bodily injury, sickness or disease." It received that evidence to assist it in determining when those events take place. The evidence in the record amply supports the circuit court's finding that "bodily injury" occurs when asbestos fibers are inhaled and retained in the lung. We therefore conclude that an insurer whose policy was in force at the time a claimant was exposed to asbestos must provide coverage of that claim.

As we have already noted, "sickness" and "disease" are included within the policy definition of "bodily injury," and therefore, also trigger coverage. The circuit court found that the plain meaning of the term "disease" is "a condition of the living animal *** or one of its parts that impairs the performance of a vital function." The court concluded, on the basis of this definition, that an asbestos-related disease occurs when it progresses to the point at which it significantly impairs the lungs' function. When that point is reached, the disease is ordinarily capable of clinical detection and diagnosis. The appellate court found no reason to disturb the trial court's finding that the manifestation of a disease also triggers coverage. Given the ordinary meaning of the term "disease," we agree that the evidence supports the

conclusion that disease occurs, and therefore triggers coverage, when it becomes manifest. The time when a disease is reasonably capable of diagnosis varies depending upon factors unique to each individual. Therefore, as the circuit court correctly held, the question of when a disease became manifest must be resolved in the context of a particular case.

The circuit court also found that the "body's condition is clearly not normal" during the time preceding the manifestation of a disease. The court found that the term "sickness" is defined as "ill health, a disordered, weakened or unsound condition." Given this definition, the court concluded, and the appellate court affirmed, that an individual who "suffers from a disordered, weakened or unsound condition" which has not yet progressed to the point of impairment characteristic of "disease," may be classified as having a "sickness," which would also trigger coverage under the policies. Again, we believe that this conclusion finds ample support in the record. As in cases in which the claimant alleges "disease," when "sickness" occurred is a question of fact to be decided on a case-by-case basis.

We turn now to Raymark's contention that the circuit court and the appellate court erroneously determined that there is no continuing bodily injury between the time a claimant's exposure to asbestos ends and the time an asbestos-related disease becomes diagnosable. Raymark maintains that this finding is contrary to the manifest weight of the evidence and inconsistent with the court's other findings. Given the fact that the tissue of the lungs is injured when asbestos fibers are inhaled, it may seem illogical to conclude that an individual, who is known to have been exposed to asbestos, and who later developed an asbestos-related disease, suffered no "bodily injury" between the cessation of exposure and the diagnosis of the disease. Nevertheless, the expert

testimony in the record establishes that asbestos-related disease may or may not progress during periods of non-exposure. The evidence shows that the diseases originate with the inhalation of asbestos fibers, and, the *continued inhalation* of asbestos causes additional injuries which eventually culminate in a disease. As both the circuit court and the appellate court properly concluded, there is no evidence in the record to support Raymark's contention that the disease progresses in every case after exposure ends. In fact, the evidence indicates that there are cases in which the disease progresses during periods of nonexposure and cases in which there is no progression. We therefore conclude that both the circuit court and the appellate court properly rejected Raymark's contention that those who ultimately manifest an asbestos-related disease necessarily sustained "bodily injury" between the time when they were no longer exposed to asbestos and the time when their disease manifested itself.

In summary, we hold that under the plain and unambiguous language of the policies at issue, the insurer must provide coverage of asbestos-related claims if the claimant in the underlying action suffered "bodily injury," "sickness" or "disease" during the policy period. "Bodily injury" takes place at or shortly after the time a claimant was exposed to asbestos and continues throughout a claimant's exposure to asbestos. Thus, an insurer that was on the risk during the time the claimant was exposed to asbestos must provide coverage. "Disease" takes place when it is reasonably capable of clinical detection and diagnosis. The determination of when a claimant's disease was reasonably capable of diagnosis must be made on a case-by-case basis. "Sickness" takes place at any time during which the claimant "suffers from a disordered, weakened or unsound condition" before the clinical manifestation of a disease. Whether and

when a claimant suffered "sickness" must be determined on a case-by-case basis. Accordingly, the judgment of the appellate court is affirmed with respect to its determination as the events which give rise to the insurers' obligations to provide coverage of asbestos-related claims.

## II. DO THE TERMS OF RAYMARK'S PRE-1967 POLICIES REQUIRE THE PRIMARY INSURERS TO DEFEND NEW ACTIONS AND TO CONTINUE TO DEFEND ACTIONS PENDING AGAINST RAYMARK AFTER THE LIMITS OF LIABILITY UNDER THOSE POLICIES HAVE BEEN EXHAUSTED BY THE PAYMENT OF JUDGMENTS OR SETTLEMENTS?

As cross-appellant, Raymark contends that its pre-1967 insurers have a duty to continue to pay defense costs in all asbestos-related lawsuits, whether currently pending or subsequently commenced against Raymark, even after the indemnity limits of their various policies have been exhausted by payment of judgments or settlements. The insurer's duty to defend its insured arises from the undertaking to defend as stated in the contract of insurance. (*Conway v. Country Casualty Insurance Co.* (1982), 92 Ill. 2d 388, 394.) Raymark contends that its pre-1967 policies contain no language limiting the insurers' duty to defend. To determine the scope of the insurers' duty to defend under these policies, we turn to the policy language.

The introductory sentence of each of the policies issued to Raymark before September 26, 1967, provides that the insurer "agrees with the insured *** subject to the limits of liability *** and other terms of this policy." Immediately following this sentence, and under the title "Insuring Agreements," the policies set forth the various insuring agreements. Insuring Agreement I provides various coverages, including coverage for bodily injury li-

ability. Insuring Agreement II in Federal's policies provides:

"II. Defense, Settlement, Supplementary Payments.

With respect to such insurance as is afforded by this policy, the company shall:

(a) defend any suit against the insured alleging such injury, sickness, disease *** and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient.

*** and the amounts so incurred, except settlements of claim and suits, are payable by the company in addition to the applicable limit of liability of this policy."

The defense insuring agreements contained in Commercial Union's policies are nearly identical to those included in Federal's policies.

The appellate court concluded that the introductory sentence of the policies specifically rendered each of the insuring agreements, including the duty to defend, subject to the policy's indemnity limits. (145 Ill. App. 3d 175, 192-93.) Accordingly, the court held that an insurer's duty to defend is discharged after its duty to indemnify has been fully discharged by the payment of judgments or settlements to the extent of its policy limits and it has made an orderly withdrawal from Raymark's defense. (145 Ill. App. 3d 175, 193-94.) Raymark argues that the appellate court erred in concluding that the phrase "subject to the limits of liability" confines the duty to defend as provided in Insuring Agreement II. According to Raymark's construction of the plain and unambiguous language of the policies, the phrase "subject to the limits of liability" somehow qualifies only the duty to indemnify set forth in Insuring Agreement I. We find this argument to be without merit. The introductory phrase, "subject to the limits of liability," clearly means that all rights and duties—including the duty to defend—

are subject to liability limits of the policy. Moreover, Raymark's own interpretation of the introductory sentence belies the construction it urges us to accept. As explained below, it contends that a different phrase contained in the introductory sentence applies to the defense provision of Insuring Agreement II.

Raymark argues that the appellate court improperly focused its attention on the phrase "subject to the limits of liability," and notes that the policy's introductory sentence also renders the insuring agreements "subject to the *** other terms of this policy." Raymark then notes that Insuring Agreement II contains an "other term" that provides that defense costs are to be paid "in addition to the applicable limit of liability." Therefore, Raymark concludes, according to the unambiguous language of the policy, the duty to defend pursuant to Insuring Agreement II is not "subject to the limits of liability." If we were to consider only those provisions of the policy quoted by Raymark to the exclusion of other policy language, the duty to defend would appear to be unlimited. An insurance contract must, however, be interpreted from an examination of the complete document and not an isolated part. *Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 493.

The introductory phrase contained in Insuring Agreement II of Federal's policies states that the insurer will provide a defense "[w]ith respect to such insurance as is afforded by this policy." Commercial Union's policies contain a nearly identical provision. The parties agree that the quoted language limits the insurer's obligation to defend. They differ as to whether the duty to defend is limited only to the type of coverage afforded by the policy or to both the type and amount of coverage afforded. Raymark maintains that the introductory phrase to Insuring Agreement II means only that the insurer must defend any suit which may give rise to the type of

liability for which indemnity coverage is afforded by the policy. Federal, on the other hand, takes the position that the language refers to the amount of indemnity coverage as well as to the type of coverage.

We believe that the only reasonable interpretation of the language in question limits the duty to defend to the amount of coverage as well as to the type of coverage provided. To date, no Illinois court has had occasion to decide the extent to which the phrase "[w]ith respect to such insurance as is provided by this policy" limits the insurer's duty to defend. The Supreme Court of Georgia has construed this phrase as a limitation not only as to the type of coverage but also as to the amount of coverage provided. (*Liberty Mutual Insurance Co. v. Mead Corp.* (1963), 219 Ga. 6, 9, 131 S.E.2d 534, 536.) In reaching that conclusion, the court reasoned that: "Insurance is composed not only of *type* of coverage, but also *amount* of coverage. To be insured only as to type of coverage is no protection at all. Another dimension is involved, the *amount* of that coverage." (Emphasis in original.) (219 Ga. 6, 9, 131 S.E.2d 534, 536.) We find this reasoning persuasive and conclude that the introductory phrase to Insuring Agreement II limits the duty to defend to the amount of indemnity coverage afforded by the policy as well as to the type of coverage afforded.

As already noted, the insurers undertook to pay defense costs and various supplemental expenses "in addition to the applicable limit of liability" of their policies. Nevertheless, we do not construe this provision, as Raymark does, to create an independent and continuing obligation to pay the cost of defending claims against Raymark *ad infinitum*. Rather, as Commercial Union contends, we believe that this provision was included so that defense costs and other enumerated expenses the insurer agreed to pay pursuant to Insuring Agreement II would not reduce the limits of liability available for

payment of judgments or settlements. If this provision were not included, then any payments made under Insuring Agreement II, just as amounts paid in settlement of claims and suits, could be properly charged against the indemnity limits of the policy.

Raymark seeks to avoid this conclusion by arguing that the duty to defend is an independent undertaking of the insurer that exists in addition to the duty to indemnify. Raymark's argument is premised on this court's statement that "an insurer's duty to defend and its duty to indemnify are separate and distinct and *** the former duty is broader than the latter." (*Conway v. Country Casualty Insurance Co.* (1982), 92 Ill. 2d 388, 394.) The duty to indemnify arises only when the insured becomes legally obligated to pay damages in the underlying action that gives rise to a claim under the policy. The duty to defend an action brought against the insured, on the other hand, is determined solely by reference to the allegations of the complaint. If the complaint alleges facts which bring the claim within the potential indemnity coverage of the policy, the insurer is obligated to defend the action. (*Thornton v. Paul* (1978), 74 Ill. 2d 132, 144; *Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 193-94.) Thus, the insurer must defend an action even though it *may not* ultimately be obligated to indemnify the insured. Where the insurer has exhausted its indemnity limits, however, the insurer *cannot* ultimately be obligated to indemnify the insured. Thus, the duty to defend is broader than the duty to indemnify only when the insurer has the potential obligation to indemnify. But when, as here, the insurer has no potential obligation to indemnify it has no duty to defend.

Finally, Raymark notes that the standard form comprehensive general liability policy was subsequently amended to expressly relieve the insurer of its obligation to defend after the applicable limit of its liability has

been exhausted. Raymark contends that this subsequent amendment establishes that its pre-1967 policies contain an unqualified promise to pay defense costs. Because we find no ambiguity in the language of the policies at issue, the provisions of later policies are irrelevant to our analysis. Accordingly, we conclude that pursuant to the plain and unambiguous terms of the policies issued before September 26, 1967, by Federal, Commercial Union and their predecessors in interest, the insurers' duty to defend suits against Raymark is subject to the liability limits of those policies and is further limited to the defense of claims with respect to which insurance is afforded by the policies. Once the applicable indemnity limits of a policy are exhausted by the payment of judgments or settlements, no insurance is afforded by that policy. We therefore hold that when an insurer has properly exhausted its policy limits by the payment of judgments and/or settlements, it is no longer obligated to defend any actions against Raymark, whether such actions are pending at the time of exhaustion or commenced thereafter. For the foregoing reasons, the judgment of the appellate court is affirmed in that it held that the pre-1967 policies do not oblige the insurers to assume the costs of defending actions against Raymark after their duty to indemnify has been discharged by the payments of judgments or settlements and they have made an orderly withdrawal from Raymark's defense.

### III. DO THE TERMS OF RAYMARK'S POST-1967 POLICIES REQUIRE ZURICH TO CONTINUE TO DEFEND ACTIONS PENDING AGAINST RAYMARK AFTER THE LIMITS OF THOSE POLICIES HAVE BEEN EXHAUSTED BY THE PAYMENT OF JUDGMENTS OR SETTLEMENTS?

We turn now to the question of the extent of Zurich's duty to defend claims against Raymark pursuant to the

terms of its policies issued after September 26, 1967. Raymark concedes that the defense provision in those policies terminates Zurich's defense obligation with respect to cases that are filed after the indemnity limits of those policies are exhausted. With regard to cases that are pending at the time of exhaustion, however, Raymark contends that Zurich's duty to defend continues until another insurer assumes the defense.

The defense clause of Zurich's policies provides:

> "[T]he company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury *** but the company shall not be obligated *** to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements."

The circuit court found that this provision was clear and unambiguous. It initially concluded, however, that this provision required the insurer to continue to defend and to absorb the costs of those cases that it had already undertaken to defend prior to the exhaustion of the indemnity limits. Zurich moved to modify the court's order to permit it to withdraw from pending cases unconditionally once its policy limits were exhausted. On rehearing, the court modified its order to provide that an insurer, upon exhaustion of its policy limits, is not obligated to continue to defend cases then pending against Raymark if another insurer is also obligated to defend Raymark in those cases. In that event, the court ruled, Raymark must tender the cases to the other carrier. The court then held that the first insurer is entitled to cease defending those cases once the new carrier assumes their defense. The appellate court held that Zurich's duty to defend pending cases terminates upon the exhaustion of the policy limits and, accordingly, modified the circuit court's order. 145 Ill. App. 3d 175, 196.

Raymark first argues, as it did in the appellate court, that Zurich sought or consented to the order and therefore has waived any right to appeal from it. The record, however, fails to support Raymark's argument. The terms of the proposed order that Zurich tendered to the court with its motion to reconsider differ considerably from the terms of the order the court entered. Zurich's proposed order would have enabled it to terminate the defense of a pending case upon the exhaustion of its policy limits irrespective of whether another carrier was obligated to defend the case and assumed its defense. As already noted, however, the court's order permitted Zurich to withdraw from the defense of an action only if another carrier was obligated to defend that action and then only after that carrier assumed the defense of the action. Moreover, Zurich objected to the entry of the court's order because its language was more restrictive than the language of Zurich's proposed order. Thus, Zurich neither sought nor consented to the order from which it now appeals. Rather, as the appellate court correctly noted, Zurich merely prepared that order at the direction of the circuit court. Therefore the appellate court properly concluded that Zurich did not waive this issue.

On the merits, Raymark contends that the trial court's decision was just and proper. In support of this argument, Raymark asserts that nothing in the policy language alerts the insured that its defense in pending cases will be terminated upon exhaustion of the indemnity limits. We find this argument to be without merit. An insurer's duty to defend its insured arises from the undertaking to defend as stated in the policy. (*Conway v. Country Casualty Insurance Co.* (1982), 92 Ill. 2d 388, 394.) The plain and unambiguous language of Zurich's policies provides that "the company shall not be obligated *** to defend *any* suit after the applicable limit of

the company's liability has been exhausted by payment of judgments or settlements." (Emphasis added.) This language clearly and explicitly manifests the parties' intention to limit Zurich's obligation to defend all actions, including pending actions, to the period of time prior to the time when its obligation to indemnify is discharged by the payment of judgments or settlements. We therefore affirm the judgment of the appellate court to the extent that it held that Zurich is not obligated to continue to defend actions pending against Raymark after the limits of its policies are exhausted by the payment of judgments or settlements.

## IV. SHOULD THE DEFENSE AND INDEMNITY COSTS OF EACH CLAIM BE ALLOCATED AMONG THE VARIOUS PRIMARY INSURERS AND RAYMARK ON A *PRO RATA* BASIS?

Having determined that the insurers are obligated to provide coverage if bodily injury, sickness or disease occurs during the policy period, we note that in most cases more than one insurance carrier will be obligated to provide coverage in an action against Raymark for an asbestos-related disease. Zurich contends that the appellate court erred in affirming the circuit court's denial of its post-trial motion to order the *pro rata* allocation of the indemnity and defense costs of each claim among the triggered policies. Raymark, on the other hand, contends that each carrier whose policy is triggered is jointly and severally liable for the total indemnity and defense costs of a claim without proration.

The appellate court relied on the language of the policies. Zurich undertook to "pay on behalf of [Raymark] all sums which [Raymark] shall become legally obligated to pay as damages because of *** bodily injury *** caused by an occurrence." Zurich further agreed "to defend any suit against [Raymark] seeking damages on ac-

count of such bodily injury." The court found nothing in the policy language that permits proration. Zurich urges this court to adopt the *pro rata* approach set forth in *Insurance Co. of North America v. Forty-Eight Insulations, Inc.* (6th Cir. 1980), 633 F.2d 1212, *aff'd on rehearing* (1981), 657 F.2d 814, *cert. denied* (1981), 454 U.S. 1109, 70 L. Ed. 2d 650, 102 S. Ct. 686.

In *Forty-Eight Insulations,* the court held that the insurers' obligations under their respective policies were triggered only by a claimant's exposure to asbestos during a policy period. From this premise, that court concluded that the exposure theory provided a reasonable means of allocating the costs of defense and indemnification among the triggered policies based on the number of years of exposure. As already noted, unlike *Forty-Eight Insulations,* this court has held that an insurer must afford Raymark coverage of a claim if the claimant suffers bodily injury *or* sickness *or* disease during a policy period. Having rejected the premise underlying the *pro rata* allocation approach adopted in *Forty-Eight Insulations,* we conclude that the appellate court did not err insofar as it declined to order the *pro rata* allocation of defense and indemnity obligations among the triggered policies.

### V. WAS FEDERAL ENTITLED TO A JURY TRIAL?

Federal contends that the appellate court erred in upholding the circuit court's order striking its jury demand. Section 13 of article I of the Illinois Constitution provides that "The right of trial by jury as heretofore enjoyed shall remain inviolate." In *Lazarus v. Village of Northbrook* (1964), 31 Ill. 2d 146, 148, this court interpreted this provision to guarantee the right to trial by jury as it existed in common law actions when the Constitution was adopted. Actions for a declaratory judgment were unknown to the common law (*Freeport Motor*

*Casualty Co. v. Tharp* (1950), 406 Ill. 295, 299, *overruled in part on other grounds, People ex rel. Schwartz v. Fagerholm* (1959), 17 Ill. 2d 131, 137), and are neither legal nor equitable, but are *sui generis* (*Freeport Motor Casualty Co. v. Tharp* (1950), 406 Ill. 295, 299). Consequently, the right to trial by jury depends upon the relief sought. When a declaration of rights is the only relief sought, the predominant characteristics of the issues in dispute determine whether there exists the right to a jury trial. If additional relief is sought, the nature of that relief determines the right to a trial by jury. *Lazarus v. Village of Northbrook* (1964), 31 Ill. 2d 146, 148.

This case concerns a complaint and a counterclaim, both of which seek only a declaratory judgment. The appellate court affirmed the circuit court's determination that Zurich's complaint essentially states a claim for equitable contribution and that Raymark's counterclaim is an action for specific performance. Federal contends that the appellate court erred in characterizing these claims as equitable in nature. We need not address this contention. Both Zurich and Raymark seek only a declaration of rights. The issues in dispute concern the construction of a contract. The construction of a contract and the determination of the rights and obligations of the parties to the contract are questions of law, the determination of which rests exclusively with the court. For these reasons, the judgment of the appellate court is affirmed insofar as it held that there was no right to a jury trial on either the complaint or the counterclaim.

## VI. RULINGS ON MOTIONS TO STRIKE

Finally, we must rule upon several motions that were taken with the case. Zurich, Federal and Commercial Union joined in motions to strike the *amicus curiae* briefs of United States Gypsum Company (Gypsum) and Armstrong World Industries, Inc., *et al.* (Armstrong) on

the ground that they improperly attempt to supplement the record. Gypsum and Armstrong filed objections and the motions were ordered taken with the case. Thereafter, *amicus curiae* Liberty Mutual Insurance Company (Liberty Mutual) also moved to strike the *amicus* briefs of Gypsum and Armstrong. Gypsum and Armstrong filed objections, and we ordered Liberty Mutual's motion to be taken with the case.

The movants contend that the *amici* improperly attempt to supplement the record on appeal by referring to materials prepared by the insurance industry concerning the drafting history of the standard form comprehensive general liability policy. Raymark, in the trial court, attached these materials as an appendix to its memorandum in support of its response to Commercial Union's motion for partial summary judgment and in support of its own cross-motion for partial summary judgment on the coverage issue. Zurich, Federal and Commercial Union moved to strike Raymark's appendix, arguing that since the circuit court had previously found that the policy language was unambiguous, the drafters' intent could not be determined by reference to extrinsic evidence and thus the materials submitted were irrelevant. These materials were not received into evidence before the circuit court.

Gypsum has appended these materials to its *amicus* brief. Both Gypsum and Armstrong refer to and present arguments based upon those materials in their *amicus* briefs.

We turn first to the motion of *amicus* Liberty Mutual. This court has stated that "[b]y definition, an '*amicus curiae*' is not a party to the action, but a friend of the court. As such, the sole function of an *amicus* is to advise or make suggestions to the court. *Bee Chemical Co. v. Service Coatings, Inc.* (1969), 116 Ill. App. 2d 217, 226." (*Fiorito v. Jones* (1978), 72 Ill. 2d 73, 96.) In light

of the limited function of *amici*, we deem Liberty Mutual's motion to be irregular and inappropriate. No rule of this court permits *amici* to engage in motion practice before this court *inter se*. Moreover, to permit *amici* to engage in such motion practice would effectively elevate *amici* to litigants before this court. Accordingly, Liberty Mutual's motion to strike is denied.

Finally, we address the motions of Zurich, Federal and Commercial Union. As already stated, the materials Raymark filed below and upon which Gypsum and Armstrong rely were not received into evidence and therefore are not part of the record on appeal before this court. Consequently, the motions of Zurich, Federal and Commercial Union to strike the *amicus curiae* briefs of Gypsum and Armstrong are allowed.

For the foregoing reasons, the motion of *amicus* Liberty Mutual to strike the *amicus curiae* briefs of Gypsum and Armstrong is denied; the motions of Zurich, Federal and Commercial Union to strike the *amicus curiae* briefs of Gypsum and Armstrong are allowed; and, the judgment of the appellate court is affirmed.

> *Motion of Liberty Mutual denied;*
> *motions of Zurich, Federal and*
> *Commercial Union granted;*
> *judgment affirmed.*

JUSTICE WARD took no part in the consideration or decision of this case.

JUSTICE SIMON, concurring in part and dissenting in part:

I concur in the court's opinion but believe that exhaustion of the limits of liability of both the pre- and post-1967 insurance policies does not relieve the insurers of responsibility for the defense of pending cases. I am persuaded by the arguments advanced by Raymark that

the policies contain no language limiting the insurer's duty to defend pending cases. The majority opinion fairly and clearly sets forth Raymark's interpretation of the policies and I see no reason to add thereto, except to state that I find Raymark's construction more reasonable than the construction applied by the majority. It would indeed be a strange agreement that allowed an attorney to walk off a case the moment the limit of the insurer's liability was reached, leaving the court and the plaintiff high and dry. Not only is such a practice fundamentally unfair to the plaintiff, but would also result in needless delays and a tremendous waste of judicial resources.

The language of both the pre- and post-1967 policies does not preclude continuation of defense of pending cases by the insurer. As I read the obligation which appears in Insuring Agreement II of the pre-1967 policies, which makes costs of defense "payable by the [insurance] company in addition to the applicable limit of liability of this policy," the insurer is required to shoulder the costs of defense even after the policy limits have been reached. Similarly, the post-1967 policy language stating that "the [insurance] company shall not be obligated *** to defend any suit *after* the applicable limit of the company's liability has been exhausted by payment of judgments or settlements" (emphasis added) refers only to suits filed after the applicable limits of liability have been exhausted, not to pending suits.

Accordingly, I believe that the clauses contained in the policies set forth in parts II and III of the majority opinion relieve the insurers only of defense of suits filed after liability limits have been exhausted, and not to pending suits. The circuit judge was correct in permitting an insurer to withdraw from the defense of a pending case only if another carrier is obligated and in fact assumes the defense of the action.