INTERNATIONAL ENVIRONMENTAL CORPORATION, Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Hartford Insurance Company, and Insurance Company of North America, Defendants.

No. 92 C 7693.

United States District Court, N.D. Illinois, E.D.

Dec. 1, 1993.

Robert A. Downing and Eugene A. Schoon (argued), Sidley & Austin, Chicago, IL, for plaintiff Intern. Environmental Corp.

John F. Brennan, Clausen, Miller, Gorman, Caffrey & Witous, Chicago, IL, for defendant Nat. Union Fire Ins. Co.

Stephen C. Debboli, Modesto, Reynolds & McDermott, Chicago, IL, for defendant Ins. Co. of North America.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This declaratory judgment action arises in the wake of a failed HVAC system in a local Chicago highrise. Plaintiff International Environmental Corporation ("IEC") has sought declaratory relief against three insurance companies in connection with claims filed against IEC charging that it supplied faulty fan coil units for use in the HVAC system. Each of the four parties have filed motions for summary judgment. For the following reasons we grant in part and deny in part National Union Fire Insurance Company's ("National Union") motion, grant IEC's motion, deny Hartford Insurance Company's ("Hartford") motion, and deny Insurance Company of North America's ("INA") motion.

### I. Summary Judgment Standard

■■■ Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Moreover, we must view the record and all possible inferences in the light most favorable to the non-moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 922 (7th Cir.1988). Summary judgment should be denied "where there is reason to believe that the better course would be to proceed to a full trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

### II. Factual Background

In 1986 and 1987, the general contractor for the 3660 North Lake Shore Drive Building contracted with Economy Mechanical Industries of Illinois, Inc. ("EMI") to install a heating, ventilation and air conditioning ("HVAC") system in the building. EMI, in turn, purchased vertical fan coil units from IEC. After installation, EMI conducted routine performance tests of the fan coil system, during which several of the risers[1] failed, resulting in cracked pipes and water leakage. Specifically, these failures occurred on May 22, 1987, June 15, 1987, June 18, 1987, July 6, 1987, July 7, 1987, July 9, 1987 (two failures), and July 18, 1987 (two failures). None of the parties dispute that leaks continued to occur in 1988, 1989, 1990, and 1991.

Concerned about the cause of the cracking, the building owners, Waveland Associates Phase I Limited Partnership ("Waveland"), hired metallurgical engineers to investigate the leaks and the condition of the piping.[2]

---

1. Risers are pipes carrying heated or chilled water through the fan coil system.

2. As early as July 22, 1987, IEC stated in a letter to EMI that, in addition to other efforts to resolve the pipe problem at North Lakeshore, it had notified its insurer about the ongoing difficulties. Hartford's 12(m) Stmt. at Exh. F.

After viewing samples drawn from piping throughout the building, Waveland's engineers concluded that external pressures brought to bear on the piping as installed, along with the presence of moisture and ammonia on the piping itself, combined to create the conditions necessary for stress corrosion cracking. The reports do not conclusively establish from where the ammonia came. Normal amounts of ammonia were detected in the insulation (not manufactured by IEC) and high levels were found in a leak-detection mixture applied to pipe joints by EMI to check for cracks. While these findings suggest that the leak-detection fluid and/or the installation lies at the bottom of the mystery, no party has offered evidence demonstrating with certainty that the mixture or the construction is the culprit. In fact, the parties seem to agree that the source of the problem is unclear.

Next, Waveland enlisted mechanical engineers to examine the installation of the HVAC systems. After inspecting the building, these engineers determined that defects in the installation of the fan coil units within the HVAC system exposed the pipes to undue strain, leading to cracking and stress corrosion as well as damage to the fan coil units.

Based upon these results, Waveland, who had been sued by EMI for payments assertedly due on its contracts, filed a counterclaim against the mechanical subcontractor for recovery, citing damages of approximately $20,000,000. In its original counterclaim, Waveland sought damages for (1) the cost of investigating the problem, (2) the cost of repairing water damage stemming from the leaks, and (3) the cost of repairing faulty pipes. Subsequently, Waveland amended its claim to include replacement of the entire fan coil system.

In April, 1989, EMI filed a third party action against IEC, claiming that IEC was responsible for the malfunctions and damage and seeking indemnity and/or contribution. This litigation, proceeding as *McHugh Construction v. Midwest bank & Trust Co., Economy Mechanical Industries v. International Environmental Corp.*, No. 88–CH–2449 ("*McHugh* litigation"), is currently pending in the Circuit Court of Cook County, with Sidley & Austin representing IEC. To date, IEC has not been held liable for any of the damage sustained at the building site.

Throughout its travails at 3660 North Lake Shore Drive, IEC carried the following insurance policies:

### A. National Union Policies

National Union Fire Insurance Company ("National Union") issued IEC two Commercial General Liability insurance policies ("CGL's") effective from April 22, 1985 to January 11, 1988. Upon learning of EMI's third party complaint against IEC, National Union, in 1989, offered to defend the embattled company. At the same time, the insurance company denied that the policy covered EMI's claims against IEC and enumerated those provisions of the policy that National Union believed excluded coverage.

Under each of the policies, IEC was required (in the form of premium payments) to reimburse National Union approximately 119% for any sums expended by the insurance company in IEC's defense. IEC has not taken advantage of National Union's offer to defend, nor has IEC submitted any bills to this insurer.

### B. Hartford Policy

Hartford insured IEC from January 11, 1988 through April 10, 1990. The policy at issue provides as follows:

(a) We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under supplementary payments—coverage a and b. This insurance applies only to 'bodily injury' and 'property damage' which occurs during the policy period. The 'bodily injury' or 'property damage' must be caused by an 'occurrence.'

As with most insurance policies, however, the Hartford policy contains various exclusions. For example, by its terms, the policy does not apply to the following:

(k) property damage to 'your product' arising out of it or any part of it.

(n) damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of (1) your product ...

If such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

On April 3, 1989, Waveland filed a counterclaim against EMI, alleging that, due to improper installation of and defect in the HVAC system, leaks had developed on or about August 4, 1987, January 5, 1988, January 6, 1988, and January 9, 1988. The counterclaim further alleged that "during the winter of 1987–88, the commercial boiler malfunctioned and therefore failed to provide heat, causing the sprinkler pipes on the first floor to freeze." Counterclaim at ¶ 17. Finally, Waveland claimed that "[n]otwithstanding repeated attempts to repair the HVAC system, corrodents remain on the pipes and the conditions for further ruptures still exist." *Id.* at ¶ 19.

On September 29, 1988, EMI filed a third party complaint against IEC incorporating the allegations contained in Waveland's counterclaim and requesting that IEC be required to indemnify EMI for any resulting liability. Upon its receipt (June, 1989), IEC tendered the third party claim to Hartford for defense. Hartford promptly responded, notifying IEC that it was researching the policy and recommending that IEC maintain Sidley & Austin as counsel.

Several months later, on October 18, 1989, having received no further information from IEC, Hartford declined to defend the action, stating that its "current understanding is that the subject occurrence preceded our policy inception date of 01–11–88." IEC's Motion for Summary Judgment, Exh. I. Asking IEC to advise it if any further information emerged that might change its assessment, Hartford indicated that it would keep its files open for another 90 days. *Id.*

On December 13, 1989, IEC wrote back to Hartford, informing its insurer that it believed Hartford's understanding was "based upon incomplete or erroneous facts." IEC's Motion for Summary Judgment, Exh. J. IEC apprised Hartford that the building owners were alleging that the pipes incorporated into IEC's fan coil units had been exposed to some corrosive agent, and that this exposure, which they alleged had been continuous since installation, caused the piping to fail. Additionally, the letter mentioned that the most recent pipe failure had occurred in March, 1989, well within the policy period. *Id.*

On January 18, 1990, Hartford responded, stating that "[i]n the event that there is any extant suit or any amended complaint filed that alleges an occurrence date that falls within our policy period, please forward same for our review." Hartford's 12(n) Statement, Exh. E. In fact, prior to this last exchange between IEC and Hartford, on June 10, 1989, Waveland amended its counterclaim to include the March, 1989 rupture, further alleging that the entire fan coil system required replacement. Moreover, after Hartford spurned IEC's tender, EMI amended its third party complaint to incorporate Waveland's new allegations. IEC failed to forward or tender either of these amended complaints to Hartford. Hartford's ·12(m) Statement ¶¶ 21 & 24; IEC's 12(n) Response ¶¶ 21 & 24. Instead, Hartford first learned of the amended third party complaint on July 8, 1992, when it received a status report on the litigation from LSB Industries (IEC's parent company). One month later, Hartford personnel met with attorneys from Sidley & Austin to discuss the case. On September 8, 1992, Hartford informed Sidley & Austin that it was sending information on the matter to Hartford's home office for review. On November 20, 1992, IEC filed the instant declaratory judgment action. Shortly thereafter, on December 8, 1992, Hartford offered to reimburse IEC for reasonable defense costs subject to reservation of rights. Although IEC rejected the offer as untimely, it has nonetheless submitted statements of its defense fees and costs to Hartford for reimbursement. To date, Hartford has made no payments.

## C. Insurance Company of North America

Insurance Company of North America ("INA") issued an Excess General Liability Policy to LSB Industries, Inc. effective April 10, 1991 through April 1, 1992. This policy has been renewed annually and presently provides coverage to IEC. Although it contains virtually identical provisions to those mentioned in connection with the Hartford policy, INA's policy differed from both National Union's and Hartford's in one key respect. INA provided IEC with an excess insurance policy, rather than a primary policy.[3] While covered by INA's excess policy, IEC established a retained limit—i.e., that amount beyond which INA's coverage is triggered—of $100,000.

INA's policy included a provision relevant to this litigation. The supplementary payments provision provides, in pertinent part:

> This policy does not apply to defense, investigation, settlement or legal expenses arising out of any occurrence but we shall have the right and opportunity to associate with the Insured in the defense and control of any claim or proceeding arising out of such occurrence reasonably likely to involve us. In such event we and the Insured shall cooperate fully.
>
> Should any occurrence appear likely to exceed the retained limit, no loss expenses or legal expenses shall be incurred on behalf of us without our prior consent.
>
> ... [S]hould the total amount for which such claim might be adjusted prior to such judgment exceed the retained limit, [$100,-000] then, if we consent to further court proceedings, we shall contribute to loss expenses and legal expenses in the ratio which its proportion of the liability for the judgment rendered, or settlement made, bears to the whole amount of the judgment or settlement.

## III. Discussion

■ Under Illinois law, an insurer has a duty to defend an insured if the insurance policy at issue covers, or arguably covers, the liability at issue. *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 699, 607 N.E.2d 1204, 1212 (1992). Once an insured tenders its defense, an insurer who believes that the policy does not potentially cover the damages described in the complaint must either defend the suit under reservation of rights or initiate a declaratory judgment action. *Waste Management, Inc. v. International Surplus Lines Ins. Co.*, 144 Ill.2d 178, 161 Ill.Dec. 774, 579 N.E.2d 322, 335 (1991). In the instant case, all of the defendant insurance companies deny any duty to indemnify IEC for the damages at issue in EMI's third party complaint, and two of the companies have failed to recognize any duty to defend. Consequently, IEC filed this declaratory judgment action to determine the parties' rights and obligations pursuant to the various insurance policies. Each of the parties has moved for summary judgment.

## A. National Union's Summary Judgment Motion

■ At the outset we observe that declaratory judgment actions are intended to determine the rights and obligations of parties to a dispute. Where the rights and obligations are not in controversy, a declaratory judgment will not obtain. Here, National Union contends that no controversy exists regarding its duty to defend IEC and, furthermore, that a declaration regarding coverage would be premature at this point. We address these arguments in turn.

### 1. Duty to Defend

In 1989, National Union acknowledged its duty to defend IEC in the *McHugh* litigation. National Union's 12(m) Stmt., Exh. B at 10. Although National Union's willingness to undertake IEC's defense would appear to obviate the need for a declaratory judgment, IEC contends that the insurance policy provision requiring IEC to reimburse National Union for 119% of defense costs effectively eviscerates any claim that National Union complied with the spirit of its duty to defend.

---

**3.** Generally, excess policies supplement primary policies, kicking in when losses exceed primary coverage. Additionally, excess policies frequently do not include a duty to defend.

Unfortunately for IEC, an insurer's duty to defend is a creature of contract. *Zurich Ins. Co. v. Raymark Industries, Inc.,* 118 Ill.2d 23, 112 Ill.Dec. 684, 695, 514 N.E.2d 150, 161 (1987); *Conway v. Country Casualty Insurance Co.,* 92 Ill.2d 388, 394, 65 Ill.Dec. 934, 442 N.E.2d 245 (1982). Here, the contract provides that IEC's premium will increase to incorporate incurred losses (including defense costs) plus a percentage of those losses. While IEC may not like these terms, it has offered no evidence that it entered into the instant insurance contract other than freely. Moreover, there is ample evidence that National Union fully complied with the terms of the contract and with Illinois law. Indeed, National Union's response to IEC's tender was textbook: National Union asserted its belief that its policy did not cover the third party claims against IEC, but acknowledged its duty to defend. The insurer then stated that it would defend the action under reservation of its rights, and proceeded to list those provisions of the insurance policy it believed precluded coverage. Finally, National Union proffered the name of the law firm it recommended. Given these actions, it is simply untenable for IEC to maintain that National Union abrogated its duty to defend.

### 2. Duty to Indemnify

While National Union denies that it has a duty to indemnify IEC for losses arising out of the *McHugh* litigation, it contends that any ruling by this Court on the insurer's duty to indemnify would be premature where, as here, the underlying litigation is ongoing.[4] *Outboard Marine,* 180 Ill.Dec. at 708, 607 N.E.2d at 1221. IEC agrees that a declaration on indemnity is properly raised only after resolution of the underlying claims at issue. However, IEC maintains that a declaratory judgment action is not premature in this instance because National Union is estopped from challenging coverage.

In Illinois, if an insurer wrongfully denies coverage or reviles its duty to defend, it is estopped from raising any policy-based defenses. *Waste Management, Inc. v. International Surplus Lines Ins. Co.,* 144 Ill.2d 178, 161 Ill.Dec. 774, 777, 579 N.E.2d 322, 335 (1991). Claiming that National Union wrongfully denied coverage in its June 8, 1989 letter, IEC argues that National Union is now estopped from disavowing its duty to indemnify IEC. We disagree.

As discussed above, there is no evidence that National Union wrongfully denied coverage when IEC tendered its defense. Absent any malfeasance on National Union's part, there can be no estoppel. Furthermore, considering the lack of any material dispute regarding estoppel, the controversy over National Union's duty to indemnify remains unripe for resolution. Accordingly, we dismiss that portion of IEC's suit.

### B. Hartford and IEC's Cross Motions for Summary Judgment

IEC seeks a declaratory judgment that Hartford has both a duty to defend IEC under its policy and that the insurer has a duty to indemnify IEC for any losses incurred as a result of the *McHugh* litigation. Both parties have moved for summary judgment.

### 1. Duty to Defend

Although the present suit presumably directs itself to a determination of the parties' rights and obligations regarding the amended third party complaint pending against IEC, in Hartford's case, the insurer's duty to defend against the *original* third party complaint is of pivotal importance.[5] At bottom, IEC argues that Hartford wrongfully refused to defend IEC against EMI's original third party complaint, thereby estopping Hartford from denying coverage under the policy.

---

4. This sensible rule prevents collateral estoppel problems from arising where a determination of rights and obligations necessarily entangles the declaratory court in fact questions central to the liability action. *Id.*

5. Indeed, once we address Hartford's duty to defend against the original complaint, there will

be little question that Hartford has a duty to defend against the amended complaint. In fact, Hartford acknowledged as much when, after reviewing EMI's amended third party complaint, it offered to reimburse IEC for reasonable defense costs.

As mentioned above, in Illinois, an insurer who wrongfully fails to defend an insured is estopped from raising defenses to coverage. The thinking behind this doctrine is that an insurer who breaches an insurance contract may not later rely on that contract to exclude coverage. Here, IEC claims that Hartford wrongfully refused IEC's tender of the original third party complaint, thereby breaching the contract. Hartford, on the other hand, maintains that EMI's original complaint did not trigger a duty to defend.

### (a) Property Damage

■■■■■ It is a staple of Illinois insurance law that an insurer has a duty to defend when an insured tenders a complaint which is potentially covered under the policy in question. Whether the claim alleges damage potentially covered under the policy is determined by comparing the complaint to the terms of the insurance policy, with any ambiguity being construed in favor of coverage. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 161 Ill.Dec. 280, 284, 578 N.E.2d 926, 930 (1991). Because IEC contends that Hartford wrongfully denied coverage upon tender of EMI's original third party complaint, and because Hartford did not see any amended pleadings prior to its decision not to defend,[6] we will look exclusively to the original pleadings in evaluating whether Hartford unjustly repudiated its duty to defend.

The Hartford policy provides coverage for property damage that occurs during the policy period and defines "property damage" as:

a. Physical injury to tangible property, including all resulting loss of use of that property; or

b. Loss of use of tangible property that is not physically injured.

IEC's Motion for Summary Judgment, Exh. F at 9. The most obvious physical injury alleged in the original pleadings is the damage caused by water leakage into various apartments. While water damage certainly constitutes physical injury, the allegations make clear that this damage occurred prior to the inception of Hartford's policy. That is, no pipe leaks are alleged after January 9, 1988, and Hartford's policy did not take effect until January 11, 1988.[7]

■■■ According to IEC, however, the pleadings tendered to Hartford alleged additional property damage. Specifically, Waveland claimed that in order to complete repairs, certain walls would need to be opened. IEC's Motion for Summary Judgment, Exh. B at ¶ 18. Moreover, Waveland charged that corrodents remained on the pipes and that a continuing stress corrosion condition presented the risk of future leaks. *Id.* at ¶ 19. While Illinois law is somewhat unclear on whether the second allegation constitutes "property damage" within the meaning of a CGL policy,[8] Illinois courts have held that where repair necessarily entails collateral property damage, insurance coverage is trig-

---

**6.** While it offers explanations for its conduct, IEC admits that it did not bring either Waveland's amended counterclaim (filed June 30, 1989) or EMI's amended third party complaint (filed December 21, 1990) to Hartford's attention.

**7.** We are unpersuaded by IEC's argument that the timing of the later leaks are potentially covered by the policy because Waveland alleges that they occurred "on or about" January 4, 5, and 9, 1988. The "on or about" language is virtually boilerplate in complaints and does not serve to seriously raise doubts about the dates of the leaks at issue.

**8.** Indeed, this has become a hotly contested area of insurance law in Illinois. While some state appellate courts have held that damage to a product already integrated into a system constitutes damage to the entire system, regardless of whether physical injury occurs to other than the

insured's own property, *see, e.g., Marathon Plastics, Inc. v. International Ins. Co.*, 161 Ill.App.3d 452, 112 Ill.Dec. 816, 514 N.E.2d 479 (4th Dist. 1987), others have explicitly rejected the notion that incorporation of a defective product wreaks physical injury sufficient to constitute property damage. *See Diamond State Ins. v. Chester–Jensen Co.*, 243 Ill.App.3d 471, 183 Ill.Dec. 435, 611 N.E.2d 1083 (1st Dist.1993). Although the Seventh Circuit has weighed in on the side of damage by incorporation, *see Eljer Mfg., Inc. v. Liberty Mut. Ins. Co.*, 972 F.2d 805 (7th Cir.1992) (Posner, J.), a more recent Illinois opinion suggests that the state favors finding property damage only where there has been physical injury to other than the insured's own property. *Diamond State*, 183 Ill.Dec. at 440–43, 611 N.E.2d at 1088–1091. Fortunately, we need not address this issue here.

gered. *See, e.g., Travelers Ins. Cos. v. Penda Corp.,* 974 F.2d 823, 832 (7th Cir.1992) (where repair of insured's allegedly defective product required destruction of attached varnishing and lithographing, property damage occurred); *Elco Industries, Inc. v. Liberty Mutual Ins. Co.,* 90 Ill.App.3d 1106, 46 Ill. Dec. 319, 414 N.E.2d 41 (1st Dist.1980) (where use and replacement of defective engine pin damaged other engine parts, property damage occurred). *Cf. Diamond State Ins. v. Chester–Jensen Co.,* 243 Ill.App.3d 471, 183 Ill.Dec. 435, 611 N.E.2d 1083 (1st Dist.1993) (in concluding that no property damage occurred, court noted the absence of allegations that repair or replacement would involve injury to other than insured's own property). Because the original pleadings clearly state that property damage to other than IEC's own product would be necessary in repairing the alleged defect in the fan coil units, the complaint was potentially covered under Hartford's policy, triggering the insurer's duty to defend.

The only remaining question is whether the property damage at issue (i.e. the physical injury incurred in repairing the leaky pipes) occurred during the Hartford policy period. Because the alleged repairs had not been undertaken at the time the original complaint was filed, Hartford might argue that it was unclear whether related property damage would occur during the policy.[9] The fact that the repairs had not yet taken place, however, does not undercut the possibility of coverage. Because the allegations of repair were made at a point in time when any repairs attempted in the next few months would be on Hartford's watch, the damage was potentially covered. Drawing all reasonable inferences in favor of coverage, then, Hartford had a duty to defend.

Hartford does argue that *Eljer Manufacturing, Inc. v. Liberty Mut. Ins. Co.,* 972 F.2d 805 (7th Cir.1992) applies to this case, directing a conclusion that the property damage in question occurred exclusively at the time of installation. Although *Eljer* arguably stands for the proposition that property dam-

age from a defective product occurs when that product is incorporated into a larger system, rather than when the damage manifests itself, this case is distinct from *Eljer. Eljer* involved a defective plumbing system that had been installed into hundreds of thousands of homes across the country. Once 5% of the systems had failed, homeowners, convinced that their own systems were likely defective, were willing to remove functioning systems based on the belief that they would inevitably fail. In ruling that the incorporation of a defective component part causes physical injury at the moment of installation, the *Eljer* court expressly noted as follows:

> We do not think that every time a component part fails, the resulting injury can be backdated to the date of installation or incorporation. The expected failure rate must be sufficiently high to mark the product as defective—sufficiently high, as is alleged to be the case regarding the Qest plumbing system, to induce a rational owner to replace it before it fails, so likely is it to fail.

Although that condition was satisfied in *Eljer,* it has not been met here. First, Waveland's original complaint sought only to recover the costs of repairing those portions of the fan coil system which had already failed. Accordingly, even if IEC's product could be thought of as multiple component parts, such that a sufficiently high failure rate of some of the fan coil units might cause a reasonable owner to replace all of the units, the original suit would not fall within *Eljer.* Furthermore, it may well be that the fan coil system is actually one integrated system, rather than a bundle of separate products, and it is not at all clear that replacement of a *single* system brings a complaint within *Eljer*'s holding. Thus, there is no escaping the conclusion that EMI's original claims were potentially covered by Hartford's policy.

### (b) Policy Exclusions

Alternatively, Hartford contends that it had no duty to defend IEC because (1) IEC

---

9. Because Hartford failed to proffer any response to the contention that physical injury incurred in repairing and/or replacing a defective component constitutes property damage, it necessarily overlooked this argument.

failed to timely notify Hartford of the claims, (2) IEC knew that the loss was probable at the time the policy began, (3) the complaint alleges only damage to IEC's own property, and (4) the policy excludes coverage for repair or replacement of a similar product. While each of these accurately sets forth possible coverage exclusions, the allegations of the original complaint do not clearly show that any of these exclusions apply. *Novak v. Ins. Admin. Unlimited, Inc.*, 91 Ill.App.3d 148, 46 Ill.Dec. 536, 539, 414 N.E.2d 258, 261 (2nd Dist.1980) ("Absent absolute clarity on the face of the complaint that a particular policy exclusion applies, there exists a potential for coverage and an insurer cannot justifiably refuse to defend.") (citing *Reis v. Aetna Casualty and Surety Co.*, 69 Ill.App.3d 777, 784, 25 Ill.Dec. 824, 387 N.E.2d 700 (1978)). We address the exclusions in turn.

### (i) Timeliness

■ Hartford's policy provides that the insured "must see to it that we are notified promptly of an 'occurrence' which may result in a claim." Here, IEC sent Hartford a copy of EMI's third party complaint in June, 1989, approximately two months after the suit had been filed. In addition to charging that this two month delay was unreasonable, Hartford maintains that the delay should be measured from IEC's first indication of an occurrence—i.e., the original pipe leaks in 1987, or, at the very latest, the March, 1989 leak.

■ In interpreting CGL's, Illinois courts have held that timeliness provisions such as the one in question place a duty on an insured to provide notice when "the circumstances of an occurrence would suggest to a reasonably prudent person that a claim for damages covered by the policy might be asserted against the insured." *National Bank of Bloomington v. Winstead Excavating*, 94 Ill.App.3d 839, 50 Ill.Dec. 414, 419 N.E.2d 522 (4th Dist.1981). Whether an insured behaves reasonably, however, depends upon the facts and circumstances of the case. *Mitchell Buick & Oldsmobile Sales, Inc. v. National Dealer Services, Inc.*, 138 Ill.

App.3d 574, 93 Ill.Dec. 71, 76, 485 N.E.2d 1281, 1286 (2nd Dist.1985). Here, IEC argues that by the time the Hartford policy began, it believed the problems with the pipes had been solved. Moreover, it understood that any pre-January 11, 1989 leaks would not fall within the ambit of Hartford's coverage. Accordingly, it was not until March, 1989, at the earliest, that an event occurred which may have warranted action on IEC's part. The question, then, is whether a three month delay violates the notice provision.[10]

Notice provisions are designed to enable insurers to conduct a timely and thorough investigation. While Illinois courts have held that four month and six month delays are untimely, in each case the court found that the insured had demonstrated a lack of diligence, thereby depriving the insurer of the opportunity to conduct a timely and thorough investigation of the injury claim. *See, e.g., Illinois Valley Minerals Corp. v. Royal–Globe Ins. Co.*, 70 Ill.App.3d 296, 26 Ill.Dec. 629, 388 N.E.2d 253 (3rd Dist.1979) (notice untimely where insured offered no excuse for six month delay and insurer missed opportunity for timely and thorough investigation); *Charter Oak Fire Ins. Co. v. Snyder*, 22 Ill.App.3d 350, 317 N.E.2d 307 (2nd Dist. 1974). The evidence in this case does not suggest either that IEC behaved cavalierly with respect to the claim or that the delay in any way undermined Hartford's investigation. Indeed, Hartford failed even to raise timeliness as an issue in responding to IEC's initial tender. In these circumstances, we find that IEC's notice was sufficiently prompt to satisfy the policy requirements.

### (ii) Known Loss Doctrine

■ An axiom of insurance law is that a person may not obtain insurance for a known loss. *Outboard Marine v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992) ("Where the Insured has evidence of a probable loss when it purchases a CGL Policy, the loss is uninsurable under that policy."). Put another way, an insured

---

10. Generally, where the facts of a case are uncontested a court may rule on timeliness as a matter of law. *INA Insurance Co. v. City of Chicago*, 62 Ill.App.3d 80, 19 Ill.Dec. 519, 521, 379 N.E.2d 34, 36 (1st Dist.1978). Because the relevant facts here are undisputed, the timeliness of IEC's notice is a question of law. *Id.*

may not purchase flood insurance as water is rising to his door. Hartford contends that the damage alleged here falls within this so-called "known loss doctrine."

■ Pointing out that IEC (1) knew of the multiple failures in 1987, (2) had been privy to the results of investigations into the leaks, and (3) had informed its then-current insurers of the situation, Hartford charges that IEC knew from the outset that losses would probably occur while Hartford was on the risk. This knowledge, the insurer insists, precludes coverage of the instant claims.

■ IEC responds that by the time Hartford's policy began, it believed the problem with the pipes had been resolved. At this point in the litigation, however, it is impossible to assess what IEC did or did not know about the pipe leaks. Most significantly, because the underlying action is still pending, we have no way of knowing what caused the late–1988, early–1989 leaks. Without that critical piece of information, we cannot conclude that IEC knew on January 11, 1989, that future malfunctions were probable. With material issues of fact outstanding as to what IEC knew at the time the policy began, the known loss doctrine does not excuse Hartford's decision not to defend IEC.[11]

### (iii) Own Product Exclusion

■ Like most CGL's, Hartford's policy contains what is known as a business risk exclusion—an exclusion predicated on the notion that insurers are not warrantors of an insured's product. Thus, as written into the Hartford contract, the exclusion precludes recovery for "property damage to your product arising out of it or any part of it." Hartford maintains that the instant case represents just the sort of circumstances encompassed by the exclusion. To be sure, EMI has sued IEC for damages which include

injury to the fan coil units (IEC's own product). However, the third party complaint also alleges damage to other property. As noted above, in order to repair the faulty pipes, Waveland claims that it will need to break open walls. Thus, judging by the complaint, the alleged injury falls outside the exclusion and affords no excuse for Hartford's failure to defend against the original third party claim.

### (iv) Repair or Replacement

■ In another business risk exception, Hartford's policy excludes coverage for:

(n) damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of (1) your product ...

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

This so-called "sistership" exclusion applies "in cases where, because of the actual failure of the insured's product, similar products are withdrawn from use to prevent the failure of these other products, which have not yet failed but are suspected of containing the same defect." *U.S. Fidelity & Guaranty Co. v. Wilkin Insulation* 144 Ill.2d 64, 161 Ill. Dec. 280, 288, 578 N.E.2d 926, 934 (interpreting same exclusion). Significantly, however, this exclusion does not apply to repair or replacement of products which have *already failed*. In those cases, the cost of replacement and repair is simply a measure of the property damage incurred.

Here, the original third party claim tendered to Hartford did not involve replacing or repairing anything other than those pipes that had already failed. Put another way,

---

**11.** Illinois courts unequivocally and uniformly endorse the notion that an insurer's duty to defend is broader than its duty to indemnify. Accordingly, while an insurer might ultimately have no obligation to indemnify an insured due to any exclusionary provision, unless the applicability of the exclusion is clear at the time the defense is tendered, it may not be used to justify a refusal to defend. *See Novak v. Ins. Admin. Unlimited,*

*Inc.,* 91 Ill.App.3d 148, 46 Ill.Dec. 536, 539, 414 N.E.2d 258, 261 (2nd Dist.1980). In fact, to permit such use would be to render the duty to defend meaningless. Thus, regardless of the ultimate merits of Hartford's known-loss arguments, because they did not clearly apply from the face of the complaint, they will not support a finding that there was no duty to defend.

neither Waveland nor EMI alleged the recall, repair, or replacement of "similar products ... which have not yet failed but are suspected of containing the same defect." Accordingly, on the face of the complaint, this exclusion does not apply to preempt Hartford's duty to defend.

The foregoing analysis permits us to reach two conclusions. First, if Hartford had a duty to defend against EMI's original third party complaint, it logically is obligated to defend against the amended complaint, which contains even more obvious allegations of potentially-covered damage. Second, in refusing to defend against EMI's amended third party complaint, Hartford breached the insurance contract.

## 2. Duty to Indemnify

As noted above, declarations regarding an insurer's duty to indemnify are premature before the underlying litigation has been resolved. This case is no exception, particularly in light of the myriad fact issues surrounding the nature and causation of the stress corrosion condition plaguing 3660 North Lake Shore Drive. IEC persists in seeking a declaration of Hartford's duty to indemnify, however, on the theory that, having wrongfully failed to defend IEC against EMI's original suit, Hartford is estopped from denying coverage in this case, therefore obviating any need to delay a ruling on the matter. *See Waste Management, Inc. v. International Surplus Lines Ins. Co.*, 144 Ill.2d 178, 161 Ill.Dec. 774, 777, 579 N.E.2d 322, 335 (1991).

The estoppel doctrine rests on the notion that a wrongful failure to defend constitutes a breach of contract. As in contract law generally, a party who has violated an agreement to the other party's detriment cannot later rely on the agreement for his own benefit. Put another way, having breached the insurance contract in question, Hartford may not proffer defenses to escape indemnification for any liability assessed against IEC in the underlying action.

 Although it acknowledges the effect of estoppel, Hartford contends that the doctrine does not apply in this instance since IEC has failed to assert, let alone establish, any prejudice stemming from Hartford's con-

duct. Hartford further maintains that Sidley & Austin's representation prohibits any serious allegation of prejudice. In Illinois, however, an insured need not demonstrate prejudice in order to obtain the benefits of estoppel. Instead, courts observe that:

> Estoppel arises as a direct result of the insurer's breach of contract.... The contract becomes no less breached because of the fortuitous existence of another insurer who is willing to meet its own obligations.

*Aetna Casualty & Surety Co. v. Coronet Insurance Co.*, 44 Ill.App.3d 744, 748–49, 3 Ill.Dec. 371, 358 N.E.2d 914 (5th Dist.1976). *See also Aetna Casualty & Surety Co. v. Prestige Casualty Co.*, 195 Ill.App.3d 660, 142 Ill.Dec. 689, 692, 553 N.E.2d 39, 42 (1st Dist. 1990) ("[The insurer's] contention that estoppel is inapplicable because [the insured] suffered no prejudice is without merit. Estoppel arises as a direct result of the insurer's breach; such breach is not exonerated by a defense of the insured by another insurer."); *Northbrook Property v. U.S. Fidelity*, 150 Ill.App.3d 479, 103 Ill.Dec. 500, 501 N.E.2d 817 (1st Dist.1986). Because prejudice is not a prerequisite to estoppel, Hartford is, as discussed above, estopped from denying coverage should IEC be held liable to EMI. As such, there is no need to suspend a ruling on this declaratory judgment action pending the outcome of the underlying litigation. Instead, we simply declare that Hartford is obligated to indemnify IEC for any losses incurred as a result of the underlying litigation which fall within the Hartford policy period and limits.

## C. INA's Motion for Summary Judgment

Finally, INA has moved for summary judgment on IEC's declaratory judgment action. The insurer, who has covered IEC from April, 1990 to the present, seeks a ruling that it owes its insured no duty to defend in the *McHugh* litigation, and that it has no duty to indemnify IEC for any liability incurred. For the following reasons, we deny INA's motion.

### 1. Duty to Defend

 In arguing that it has no obligation to defend IEC, INA points out that it provided excess insurance policies to IEC, rather

than primary policies. Thus, the policies explicitly stated that they did not apply "to defense, investigation, settlement or legal expenses arising out of any occurrence." There is, however, one exception to this express exclusion of defense responsibilities:

> [S]hould the total amount for which such claim might be adjusted prior to such judgment exceed the retained limit, then, if we consent to further court proceedings, we shall contribute to loss expenses and legal expenses in the ratio which its proportion of the liability for the judgment rendered, or settlement made, bears to the whole amount of the judgment or settlement.

INA's Motion at 4.

IEC contends that, at the very least, it is possible that this exception has been activated in the instant action. According to IEC, in December, 1992, INA refused to participate in settling the *McHugh* case for an amount in excess of $100,000 (the retained limit). IEC's Response to INA's Motion at Exh. B. As evidence, IEC cites to a letter drafted by Sidley & Austin summarizing a settlement meeting held in November, 1992. The letter clearly refers to settlement discussions revolving around a demand from EMI and outlines possible plans for payment-sharing among IEC's various insurers. Although the letter evidences that settlement negotiations had been underway, it is unclear from the missive either whether INA was unwilling to go along with the proposed divisions, or whether INA caused settlement discussions to founder.

For its part, INA's briefs are utterly devoid of any explanation of its role in the aborted settlement plans. While it may be that INA did nothing to prolong the *McHugh* litigation, the proffered letter regarding settlement talks raises the possibility that INA turned down a settlement scheme with the effect of compelling further litigation. If this is the scenario, then INA properly must share in defense costs. Given the existence of material fact questions, then, we deny INA's motion for summary judgment on its duty to defend.

### 2. Duty to Indemnify

In denying any duty to indemnify, INA raises several policy exclusions. None of them, however, are ripe for summary judgment. As discussed above, because the underlying litigation is still pending, any ruling by this Court on INA's duty to indemnify would be premature at this point. Accordingly, we dismiss this portion of IEC's suit without prejudice. *See* Section IIIA(ii).

### IV. Conclusion

For the foregoing reasons, we grant National Union's motion for summary judgment on its duty to defend and deny its motion with respect to its duty to indemnify, grant IEC's motion, deny Hartford's motion, and deny INA's motion. Because IEC's pursuit of a declaration that National Union and INA have a duty to indemnify rests upon the outcome of the *McHugh* action, we dismiss those portions of the complaint without prejudice and with leave to reinstate within thirty days of the outcome of the underlying litigation. As for IEC's claim that INA owes a duty to defend, because adjudication of this issue does not turn upon the resolution of factual disputes at issue below, it alone may proceed. It is so ordered.