**INTERNATIONAL ENVIRONMENTAL, CORPORATION, Plaintiff,**

**v.**

**NATIONAL UNION FIRE INSURANCE, COMPANY OF PITTSBURGH, PA, Hartford Insurance Company, and Insurance Company of North America, Defendants.**

**No. 92 C 7693.**

United States District Court, N.D. Illinois, Eastern Division.

July 5, 1994.

---

Robert A. Downing, Eugene A. Schoon, Sidley & Austin, Chicago, IL, for Intern. Environmental Corp.

John F. Brennan, Clausen, Miller, Gorman, Caffrey & Witous, P.C., Chicago, IL, for National Union Fire Ins. Co., of Pittsburgh, PA.

Thomas M. Crisham, Michael Cleary Bruck, Hinshaw & Culbertson, Chicago, IL, for Hartford Ins. Co.

Stephen C. Debboli, Modesto, Reynolds & McDermott, Chicago, IL, for Ins. Co. of North America.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This declaratory judgment action arises from the failure of an HVAC system installed at 3660 North Lake Shore Drive. In the aftermath of repeated pipe failures, Waveland Associates Phase I Limited Partnership ("Waveland"), the building owner, having been sued for payments due by the general contractor who installed the system, Economy Mechanical Industries, Inc. ("EMI"), counterclaimed against EMI for recovery based on the failures and on alleged defects in the system. EMI, in turn, filed a third party complaint against International Environmental Corporation ("IEC") charging IEC with supplying faulty fan coil units for use in the HVAC system.[1] As a result, IEC sought declaratory relief against three insurance companies in connection with these claims. Each of the four parties filed motions for summary judgment, which we decided in December of last year.[2] In the wake of

---

1. This litigation, proceeding as *McHugh Construction v. Midwest Bank & Trust Co., Economy Mechanical Industries v. International Environmental Corp.*, No. 88–CH–2449 ("*McHugh* litigation"), is currently pending in the Circuit Court of Cook County.

2. We granted in part and denied in part National Union's motion for summary judgment, dismissing the remaining claims against National Union without prejudice, granted IEC's motion for summary judgment against Hartford and denied Hartford's motion for summary judgment against IEC, finding that Hartford had abrogated its duty to defend its insured, and denied INA's motion for summary judgment, also dismissing all issues

**514**

our December 1, 1993 Memorandum Opinion and Order ("Order"), 843 F.Supp. 1218, the parties filed the following motions: (1) Hartford Insurance Company ("Hartford") moved for reconsideration, (2) Insurance Company of North America ("INA") sought clarification and/or reconsideration, (3) Hartford sought leave to file a cross-claim against National Union Fire Insurance Company ("National Union"), and (4) IEC moved for entry of judgment against Hartford and to voluntarily dismiss its action against INA for any duty to share defense costs. For the following reasons, we grant in part and deny in part Hartford's motion to reconsider, grant in part and deny in part INA's motion for clarification and/or reconsideration, deny Hartford's motion for leave to file a cross-claim against National Union, deny as moot IEC's motion for entry of final judgment, and grant IEC's motion for voluntary dismissal.

## I. Discussion [3]

### A. Hartford's Motion to Reconsider

In our Order, we granted summary judgment for IEC and against Hartford, concluding that, because EMI's original third party complaint against IEC (incorporating the allegations of Waveland's original counterclaim) contained allegations that destructive

repairs due to the January, 1988 leaks would potentially be necessary during the Hartford policy, Hartford's policy was triggered and the insurer had a duty to defend IEC. Having found that Hartford abrogated that duty, we further concluded that Hartford was estopped from denying liability. Hartford challenges our grant of summary judgment against it, arguing that the facts of the case demonstrate that any property damage that occurred during the Hartford policy period stemmed from a single pre-policy occurrence, thus rendering that damage uninsurable under Hartford's policy as a known loss. Alternatively, Hartford contends that if the alleged property damage did not constitute a known loss, then IEC violated the policy notice provisions by waiting until June, 1989 to inform Hartford of an occurrence.

### 1. Single Pre-policy Occurrence

Even if we agree with Hartford that the damage alleged in the original complaints stem from one occurrence,[4] and even if we further agree that this occurrence can be said to have taken place before Hartford's policy incepted,[5] we disagree that this circumstance automatically absolves Hartford of its duty to defend. Hartford overlooks the fact that a single occurrence may spawn multiple incidents of property damage, which in turn may trigger several insurance policies.

relating to indemnity with leave to reinstate after the underlying litigation concluded.

**3.** The relevant facts are set forth in our original Order, *International Environmental Corp. v. National Union Fire Ins.*, 843 F.Supp. 1218 (N.D.Ill. 1993). Accordingly, we will not reiterate them here. However, we take this opportunity to correct two clerical errors contained in the Order. On page 1224 of the Order, we erroneously stated that INA's excess policy was issued on April 10, 1991. That date should read April 10, 1990. On page 1228, where it reads "Moreover it is understood that any pre-January 11, 1989 leaks would not fall within the ambit of Hartford's coverage," it should read "Moreover it is understood that any pre-January 11, 1988 leaks would not fall within the ambit of Hartford's coverage."

**4.** In Illinois, the number of occurrences is determined by looking to the cause(s) of the loss at issue rather than to the effect. *See, e.g., Mason v. Home Ins. Co.*, 177 Ill.App.3d 454, 532 N.E.2d 526, 529, 126 Ill.Dec. 841, 844 (3rd Dist.1988) (Court held that "the number of occurrences is determined by referring to the cause or causes of

the damage rather than to the number of individual claims or injuries."). However, in this case, we do not know what caused the various leaks at issue. Although some investigators have opined that stress corrosion cracking is responsible for the 1987 leaks, it remains to be seen whether stress corrosion cracking caused the later leaks. Moreover, even if we were certain that stress corrosion cracking caused all of the alleged pipe leaks, we do not know, at this point, what caused the stress corrosion cracking. Both questions comprise central issues in the underlying litigation. Accordingly, as the case now stands, open questions of material fact preclude any conclusion as to the number of occurrences here.

**5.** Although the number of occurrences is determined by looking to the cause(s) of loss, the timing of an occurrence is made by referring to the time at which injury first occurs. *See, e.g., Great American Ins. Co. v. Tinley Park Recreation Com.*, 124 Ill.App.2d 19, 259 N.E.2d 867 (1st Dist.1970). Put another way, if a party committed a negligent act on date X, but no damage occurred until date Y, we would conclude that the "occurrence" took place on date Y.

*See Zurich Ins. Co. v. Raymark Industries, Inc.,* 118 Ill.2d 23, 514 N.E.2d 150, 112 Ill. Dec. 684 (1987) (Illinois Supreme Court concluded that bodily injury *and* sickness *and* disease deriving from exposure to asbestos each trigger liability coverage). At bottom, then, while the insurer on the risk when injury first manifests itself may be liable for all damages which ensue from that occurrence, it may not be the *only* insurer liable for damages which occur during other policy periods. *Id.,* 514 N.E.2d at 165, 112 Ill.Dec. at 699 (holding insurers jointly and severally liable for injuries stemming from a single occurrence but triggering multiple policies).

### 2. Known Loss

■ While property damage stemming from a pre-policy occurrence may trigger an insurance policy, to the extent that an insured was aware that property damage was likely to occur during the policy period, the "known-loss" doctrine precludes coverage. As discussed in our original Order, an insured may not purchase insurance for a known loss. That is, a person may not obtain flood insurance as water is rising to his door, since such a purchase runs counter to the fundamental principle that insurance is based on contingent risks. *See Outboard Marine Corp. v. Liberty Mutual Ins. Co.,* 154 Ill.2d 90, 607 N.E.2d 1204, 1210, 180 Ill.Dec. 691, 697 (1992) ("Where the insured has evidence of a probable loss when it purchases a CGL policy, the loss is uninsurable under that policy (unless the parties otherwise contract) because the 'risk of liability is no longer unknown.' ") (quoting *Appalachian Insurance Co. v. Liberty Mutual Ins. Co.,* 676 F.2d 56, 63 (3d Cir.1982)).

The question here is whether IEC knew before the Hartford policy began, or reasonably should have known, that a loss would probably occur during the policy period.[6] Hartford argues that, because (1) IEC was aware of the 1987 leaks well before the Hartford policy, (2) investigators had identified stress corrosion cracking as one of the likely suspects in causing the leaks, and (3) further leaks had occurred as recently as January 5, 6, and 9, 1988, IEC must have known, or reasonably should have known, that property damage was likely to occur during the Hartford policy period. IEC responds that before the Hartford policy took effect, it believed the stress corrosion cracking had been fixed.

■ In *Outboard Marine,* the Illinois Supreme Court made it clear that, in order for the known loss doctrine to apply, the insured must *actually* know, or have reason to know, at the outset of the policy, that a loss is probable during the policy period. Specifically, the court stated:

There is no bright-line test to determine whether and at what point in time the insured knew or had reason to know of the substantial probability of the loss at issue. The extent of the insured's knowledge of the loss must be determined on a case-by-case basis. In a motion for summary judgment, the court must determine whether any factual questions exist with respect to the insured's knowledge at the time it bought each policy. If the court finds that no fact questions exist in this regard, the issue is one of law for the court to decide.

*Id.* Accordingly, we will not employ the known loss doctrine to exempt Hartford's coverage unless and until we determine that, at the time the Hartford policy incepted, IEC actually knew, or should have known, that there was a substantial probability of loss during the policy period.

---

**6.** In its briefing on the original cross-motions for summary judgment, we understood IEC to argue that EMI's third party complaint alleged several possible forms of property damage potentially covered by the Hartford policy: (1) destructive repairs stemming from the January, 1988 leaks, (2) destructive repairs stemming from the ongoing stress corrosion cracking, and (3) diminution in the value of 3660 North Lake Shore Drive due to the ongoing stress corrosion cracking. Having agreed with IEC that destructive repairs stemming from the January, 1988 leaks constitut-ed property damage that triggered Hartford's duty to defend, we did not reach the issues involving the additional alleged property damage. IEC now makes it plain that it does not seek coverage for any damage arising from the January, 1988 leaks—even damage occurring during Hartford's policy period. Regardless of whether this position is sensible, in light of IEC's clear disregard for this claim, we will address it no further, but will rest our decision on the other alleged property damage.

■ Although Hartford asserts that IEC must have known before the Hartford policy began that losses were probable during the policy period, it is unclear what IEC knew on January 11, 1988 about the condition of the pipes. The evidence indicates that remedial measures were taken in the late summer and early fall of 1987.[7] Hartford might argue that the January, 1988 leaks should have put IEC on notice that these efforts had failed to solve the problem and that future property damage was possible (in the form of destructive repairs for the ongoing stress corrosion condition they evidenced). However, IEC correctly points out that "there is no evidence that IEC was notified or otherwise aware of these [January 5, 6, and 9, 1988] failures prior to purchasing the Hartford policy on January 11, 1988." Response at 9. Moreover, it is unclear what caused the January, 1988 leaks. It may have been stress corrosion cracking, or it may have been something entirely different. In sum, questions of material fact exist with respect to whether the known loss doctrine applies here to obviate Hartford's duty to defend.

The next question is whether the existence of a material fact on the applicability of the known loss doctrine, by itself, obligated Hartford to defend the original complaint lodged against IEC. Illinois courts have not expressly addressed the issue of whether the known loss doctrine must be evident on the face of a complaint before an insurer may safely deny its duty to defend, or whether it is appropriate to resolve factual disputes surrounding an insured's knowledge before determining whether an insurer has a duty to defend.

■ As a general rule, policy exclusions must be clear on the face of a complaint before an insurer may safely deny its duty to defend without simultaneously seeking a declaratory judgment (as Hartford has done here). *See, e.g., Novak v. Insurance Admin. Unlimited, Inc.*, 91 Ill.App.3d 148, 414 N.E.2d 258, 261, 46 Ill.Dec. 536, 539 (2nd Dist.1980) ("Absent absolute clarity on the face of the complaint that a particular policy exclusion applies, there exists a potential for

coverage and an insurer cannot justifiably refuse to defend.") (citing *Reis v. Aetna Cas. & Sur. Co.*, 69 Ill.App.3d 777, 784, 387 N.E.2d 700, 25 Ill.Dec. 824 (1978)). This rule stems from the notion that an insurer's duty to defend is broader than its duty to indemnify. Thus, unless the applicability of an exclusion is clear at the time the defense is tendered, it may not be used to justify a refusal to defend, since such use would render the duty to defend meaningless.

■ Unlike policy exclusions, however, where an insurer predicates its failure to defend an action on the insured's alleged abrogation of a condition precedent to the policy, courts have looked beyond the pleadings to the facts of the case to determine whether the insurer had a duty to defend. *See, e.g., M/A Com, Inc. v. Perricone*, 187 Ill.App.3d 358, 543 N.E.2d 228, 134 Ill.Dec. 945 (1st Dist.1989) (before insurer could be estopped from raising a notice provision violation to justify its refusal to defend insured, trial court must determine whether insured actually breached the notice provision); *Reeves v. State Farm Fire and Cas. Co.*, 539 So.2d 252 (Ala.1989) (court granted summary judgment for insurer, holding that insurer had no duty to defend where insured failed to satisfy condition precedent of prompt notice of occurrence). The question posed, then, is whether the known loss doctrine is more akin to a policy exclusion or a condition precedent.

■ In our original Order, we likened the known loss doctrine to a policy exclusion and ruled that, unless the doctrine clearly applied, insurers were obligated to honor their duty to defend. However, there is a strong case to be made that the known loss doctrine more closely resembles a condition precedent than a policy exclusion. Conditions precedent to a contract or an insurance policy, by definition, are conditions that must be met in order for the contract or policy to become effective. *See, e.g., Ansvar America Ins. Co. v. Hallberg*, 209 Ill.App.3d 206, 568 N.E.2d 77, 79, 154 Ill.Dec. 77, 79 (1st Dist. 1991) ("A condition precedent is one which must be performed before a contract be-

---

7. According to IEC, the repair measures were not completed until after the alleged August 4,

1987 leak. *See* IEC's Response to Hartford's Motion for Summary Judgment, Exh. A at ¶¶ 6–8.

comes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform."). If an insured fails to meet certain pre-conditions, then the insurance policy does not take effect, and, by extension, no obligation to defend or indemnify ever attaches to the putative insurer. Exclusions, on the other hand, do not operate to void an insurance policy, but to carve out exceptions to coverage *within* the policy. Like a condition precedent, the known loss doctrine determines whether the insurance policy is ever triggered.

Additionally, like conditions precedent, known losses are rarely, if ever, evident from complaints. Instead, the best, and frequently the only, way for a court to determine whether a condition has been satisfied is to engage in a factual inquiry. On the other hand, policy exclusions (such as damage to an insured's own property, or the sistership exclusion), by their nature, are more readily discernible from the complaint itself.

 As a result, we conclude that the applicability of the known loss doctrine need not be clear from the allegations of the complaint before an insurer may refuse a tendered defense. *See Outboard Marine,* 607 N.E.2d at 1211–12, 180 Ill.Dec. at 698–99

(although court did not address the issue, on appeal from summary judgment ruling on insurers' duty to defend and indemnify, court remanded to trial court for resolution of factual questions surrounding the known loss issue). Put another way, an insurer will not have abrogated its duty to defend simply because it is unclear from the complaint that it has a viable known loss defense. Instead, an insurer may offer extrinsic evidence on the issue for a court to consider before ruling on whether a duty to defend exists.[8] Consequently, the fact questions surrounding IEC's knowledge of the pipes' condition on January 11, 1988 preclude summary judgment for either party on this issue.[9] We therefore vacate that portion of our Order granting summary judgment for IEC on this basis and turn to Hartford's notice arguments.[10]

### 3. Timeliness

In its motion for summary judgment, Hartford argued that it had no duty to defend EMI's original third party complaint because IEC failed to promptly notify Hartford of "an occurrence which may result in a claim," as required under the policy. Specifically, IEC waited until June, 1989 before sending Hartford a copy of EMI's third par-

8. In refusing a tendered defense, however, without simultaneously seeking a declaratory judgment, or, in the alternative, defending under a reservation of rights, an insurer runs the risk that the court will find that a duty to defend *does* exist and that, by failing to honor the duty, the insurer has sacrificed its right to deny liability on the policy. Accordingly, we are satisfied that this ruling does not provide incentives for insurers to recklessly deny coverage.

9. In its original motion, IEC also suggested that the original complaint alleged property damage by charging that the building had lost value based on the ongoing stress corrosion cracking. Regardless of whether Illinois courts recognize such a loss as property damage, and regardless of whether the stress corrosion cracking condition constitutes an occurrence, summary judgment on this basis must meet the same fate as that of the repairs due to the pipes' condition. Material questions of fact preclude final decision on the known loss issue.

10. IEC also contends that, because it notified Hartford of the March, 1989 riser failure in a December 13, 1989 letter, Hartford's duty to defend was triggered at that point. We disagree.

Although there is a line of cases holding that insurers are obligated to defend suits where they are aware of true but unpleaded facts which, when taken together with the complaint's allegations, indicate that the claim is potentially within policy coverage, these cases are inapposite. *See, e.g., U.S. Fidelity & Guaranty Co. v. Wilkin Insulation Co.,* 193 Ill.App.3d 1087, 550 N.E.2d 1032, 1036, 140 Ill.Dec. 907, 911 (1st Dist.1989); *Associated Indemnity Co. v. Insurance Co. of North America,* 68 Ill.App.3d 807, 386 N.E.2d 529, 538, 25 Ill.Dec. 258, 267 (1st Dist.1979). In *Associated Indemnity,* the insurer had information which, when coupled with the existing allegations, made it clear that the *accident at issue* fell within the policy coverage. Here, on the other hand, information about a March, 1989 leak, while notifying Hartford that later claims falling within its coverage might be brought, added nothing to the original complaint, but instead constituted an entirely separate claim. Put another way, unless and until the March, 1989 leak was actually incorporated into a complaint, the fact that it had occurred did nothing to render Hartford potentially liable for the property damage set forth in the original complaint. Accordingly, IEC's letter was irrelevant to Hartford's duty to defend against EMI's original third party complaint.

ty complaint—roughly two months after the suit had been filed, three months after the March, 1989 leak during the Hartford policy, over a year after the January, 1988 leaks, and almost two years after the initial riser failures.[11] Finding that the earliest event relevant to the notice issue was the March, 1989 leak, we ruled in our Order that IEC's conduct neither demonstrated lack of diligence, nor did it deprive Hartford of the opportunity to initiate a timely and thorough investigation of the injury claim. In fact, we pointed out that Hartford had failed even to raise timeliness as an issue in responding to IEC's initial tender.

 It appears, however, that the January, 1988 leaks also constitute a relevant event which may have triggered IEC's notice obligations. Although the January, 1988 leaks constituted pre-policy occurrences, knowledge of the leaks may have put IEC on notice of two sorts of potential losses during the policy period: (1) future leaks attributable to stress corrosion cracking (which the January leaks evidenced might be ongoing, despite the remediation efforts), and (2) destructive repairs to finally fix the stress corrosion cracking. To the extent that IEC should have understood that claims from any of these losses might arise during Hartford's watch, IEC was obliged under the policy to promptly notify Hartford.

IEC explains that it did not notify Hartford about the stress corrosion cracking situation until June, 1989, because it believed that the stress corrosion cracking had been solved. Accordingly, it had no reason to expect any policy claims stemming from the condition—be they claims stemming from future leaks or from destructive repairs initiated to fix the condition. On the other hand, once IEC learned of the March, 1989 leak and received EMI's original third party complaint in April, 1989, IEC promptly notified Hartford.

 Ultimately, IEC's proffered explanation, juxtaposed with the timing of events, creates a question of fact best left to the trier of fact. See *University of Illinois v. Continental Cas. Co.*, 234 Ill.App.3d 340, 599 N.E.2d 1338, 175 Ill.Dec. 324 (4th Dist.1992) (timeliness of notice by insured is question for trier of fact, unless all material facts are undisputed). That is, it is for a jury, not this Court, to determine whether IEC's stated belief that it understood the stress corrosion cracking to be gone was reasonable in light of the history of the pipes and in the face of the January, 1988 leaks.[12] Accordingly, we deny summary judgment for either party based on this issue.[13] Moreover, because the outstanding questions remaining in connection with Hartford's duty to defend touch upon the ultimate issue to be resolved in the underlying litigation—namely, what caused the various leaks—any further consideration of this issue would be premature and we dismiss this portion of IEC's suit with leave to reinstate within thirty days of the outcome of the underlying suit.[14]

## B. INA's Motion for Clarification and/or Reconsideration

In our Order we denied INA's motion for summary judgment on IEC's declaratory

---

11. Although we do not know what IEC knew about the pipes' condition on January 11, 1988, nor do we know exactly when IEC learned about the January, 1988 leaks, it is wildly improbable that IEC was in the dark about the January leaks for any meaningful period of time. Accordingly, we will assume for the purposes of this discussion that IEC knew about the January leaks at least a full year before it notified Hartford of any potential coverage.

12. Unlike the March, 1989 leak and the filing of EMI's original third party complaint, numerous fact questions surround the issue of whether the January, 1988 leaks triggered Hartford's notice provision.

13. Based on our resolution of Hartford's motion to reconsider, IEC's motion for entry of final judgment is denied as moot. Moreover, Hart-

ford's motion for leave to file a cross claim against National Union for contribution is unripe for decision at this time and is likewise denied, with leave to reinstate within thirty days of the underlying litigation.

14. In its motion for summary judgment, IEC suggests that Hartford may have violated its duty to defend the *amended* complaint. However, the basis for this contention remains unclear to the Court, particularly in light of the fact that (1) IEC waited over a year before tendering the amended third party complaint to Hartford, and (2) Hartford agreed to defend IEC against the amended third party complaint under reservation of rights. Given the lack of briefing on this issue, we will not address it here.

judgment action against it, ruling that the issues pertaining to various asserted policy exclusions were premature and that questions of fact surrounded INA's obligation to share in defense costs. INA now seeks clarification of our Order. Specifically, INA claims that (1) we failed to address its known loss argument, and (2) that we erroneously characterized its potential obligation under a Supplementary Payments provision to share in defense costs as a "duty to defend." We address these issues in turn.

### 1. Known Loss Doctrine

 IEC correctly asserts that this Court intended to include the known loss doctrine on page 23 of its Order when we ruled that inquiry into INA's various liability defenses would be premature at this point. However, because we referred solely to "policy exclusions," (which would not include the known loss doctrine), INA's current confusion regarding our Order is understandable and we will take a moment to clarify our decision.

INA points out that its policy incepted on April 10, 1990, after the *McHugh* litigation was filed and after several more riser pipes had leaked. INA argues that, given these circumstances, IEC must have known that losses would probably occur during the INA policy period. The flaw in this argument mirrors that found in Hartford's invocation of the known loss doctrine: material questions of fact continue to envelop the issue of what IEC knew, or reasonably should have known, at various points in time, including April 10, 1990.[15] Accordingly, IEC's motion for declaratory judgment on INA's duty to indemnify was dismissed without prejudice.[16]

### 2. Duty to Share Defense Costs

 INA avers that the Court made "a poor choice of terminology" when it referred to INA's obligations under the Supplementary Payments provision as a "duty to defend."

We agree. To clear up any confusion caused by this elocution, let us set the record straight. Should the Supplementary Payments provision apply, it requires INA to contribute a proportionate share of IEC's defense costs, but does not impose an independent "duty to defend."

### C. IEC's Motion to Voluntarily Dismiss

In the wake of our original Order, the sole issue remaining for adjudication was whether the Supplementary Payment provision applied, obligating INA to share in IEC's defense costs. IEC has moved the Court to dismiss this issue without prejudice and with leave to reinstate within thirty days of the outcome of the underlying action. INA objected to such action, arguing that it was entitled to an immediate ruling on its motion for clarification and/or reconsideration. Having addressed INA's motion in its entirety, and in light of the fact that we must defer ruling on INA's duty to indemnify, we agree that it would save judicial resources to postpone proceeding on the issue of whether INA must share in IEC's defense costs until after the underlying litigation is resolved. Accordingly, we grant IEC's motion and dismiss this issue with leave to reinstate within thirty days of the closing of the underlying litigation.

### II. Conclusion

For the foregoing reasons we grant in part and deny in part Hartford's motion to reconsider, deny Hartford's motion for leave to file a cross claim, deny IEC's motion for entry of judgment, grant in part and deny in part INA's motion for clarification and/or reconsideration, and grant IEC's motion for voluntary dismissal. It is so ordered.

---

15. We acknowledge that IEC's claim of ignorance, along with its correlative assertion that it believed the stress corrosion cracking had been fixed, loses credibility as time progressed and leaks continued. However, we simply cannot conclude as a matter of law that the known loss doctrine precludes coverage under INA's policy.

16. INA also asks that we clarify whether the known loss doctrine, if it does ultimately apply, would bar the application of the Supplementary

Payments provision. Indeed, if IEC knew, or reasonably should have known, that losses were probable during the INA policy period at the time that policy incepted, then the known loss doctrine will apply. As we discussed above, the known loss doctrine is a prerequisite to insurance. If, in fact, the losses for which IEC seeks indemnity from INA were known prior to the policy, then INA cannot be liable.